RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0093P (6th Cir.)
File Name: 04a0093p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

*v.*

No. 02-3931

JAMES THOMAS MCBRIDE,
*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 02-00060—George C. Smith, District Judge.

Argued: February 5, 2004

Decided and Filed: March 30, 2004

Before: NELSON, GILMAN, and ROGERS, Circuit
Judges.

---

## COUNSEL

**ARGUED:** Robert J. Dunn, Bay City, Michigan, for
Appellant. Daniel Allen Brown, ASSISTANT UNITED
STATES ATTORNEY, Columbus, Ohio, for Appellee.
**ON BRIEF:** Robert J. Dunn, Bay City, Michigan, for
Appellant. Daniel Allen Brown, ASSISTANT UNITED
STATES ATTORNEY, Columbus, Ohio, for Appellee.

---

## OPINION

---

RONALD LEE GILMAN, Circuit Judge. James Thomas
McBride was convicted of (1) presenting a false claim against
the IRS, and (2) various obstruction of justice and bankruptcy
fraud charges based upon certain financial transactions he
initiated that were related to a tax evasion case against his
girlfriend. He insisted on proceeding without the assistance
of counsel at his trial. The jury convicted him on all counts.
McBride seeks to overturn his conviction on the basis that his
waiver of counsel was ineffective and because the evidence
against him was allegedly insufficient. For the reasons set
forth below, we **AFFIRM** the district court's determination
that McBride effectively waived his right to counsel at all
stages of the proceedings and that there was sufficient
evidence to convict him on Counts 2-6, but **REVERSE**
McBride's conviction on Count 1 because there was
insufficient evidence to support the verdict on that charge.
We also **VACATE** McBride's sentence and **REMAND** for
resentencing consistent with this opinion.

### I. BACKGROUND

#### A. Factual background

Katina Kefalos was convicted by a jury, in proceedings
before District Judge Algenon L. Marbley, of evading
$12,990.67 in federal income taxes. Kefalos was McBride's
girlfriend. During the course of her trial, Kefalos fired the
two attorneys—David Axelrod and Terry Sherman—who
were appointed to represent her. Prior to Kefalos's
sentencing, McBride sent a check for the $12,990.67 to IRS
revenue agent Margaret Nypaver, who had unsuccessfully
attempted to collect this sum from Kefalos and who testified
against her at trial. McBride knew that his check would
"bounce" because it was drawn on an account that he had

closed one year earlier. He then submitted bad checks from the same account to the Franklin County Treasurer's Office to purportedly pay the real estate taxes for the first half of 2001 on the residences of Judge Marbley, attorneys Axelrod and Sherman, and agent Nypaver.

The Treasurer's Office, without waiting to see if the checks would clear, issued statements to McBride acknowledging that he had paid these real estate taxes. McBride then used the statements as evidence of his creditor status when he subsequently filed four involuntary bankruptcy petitions in the United States Bankruptcy Court for the Southern District of Ohio against Judge Marbley, attorneys Axelrod and Sherman, and agent Nypaver. He also paid the $200 filing fee for each of the bankruptcy petitions with more bad checks that were drawn on his closed account.

## B. Procedural background

McBride was indicted on the following six felony charges: presenting a false claim against the government in violation of 18 U.S.C. § 287, obstructing justice in violation of 18 U.S.C. § 1503, obstructing the due administration of the internal revenue laws in violation of 26 U.S.C. § 7212(a), and three counts of bankruptcy fraud in violation of 18 U.S.C. § 157.

In two appearances before the designated magistrate judge, McBride was advised of his right to counsel, including his right to appointed counsel if he could not afford to retain an attorney. At his arraignment, McBride elected to proceed *pro se*. David Graeff was appointed as standby counsel.

During a pretrial conference, the district court extensively questioned McBride about his decision to represent himself. McBride was first asked about his educational background and then questioned to verify that he was not under the influence of prescription medication, narcotics, or alcohol. The court also inquired about McBride's legal experience.

McBride responded that he had been a criminal defendant before, that he had assisted other people in representing themselves in several cases, and that he had participated in both federal and state criminal proceedings. The court then went over each count of the indictment in detail and stressed the severity of the penalties involved, including the possibility of consecutive sentences. With the following exchange, the court closed this line of questioning:

> THE COURT: So, you know just exactly how much jeopardy that you are in, in this proceeding? You realize that if you represent yourself, you are on your own? Do you realize that, Mr. McBride?
>
> MCBRIDE: Yes, sir, I do.

The court proceeded to ask McBride about his familiarity with the trial process, the Federal Rules of Evidence, and the Federal Rules of Criminal Procedure. McBride expressed comfort with these procedural matters. He was then advised that should he take the stand, he would have to ask questions of himself and would not be permitted to testify in narrative form. Finally, the court issued the following warnings to McBride:

> THE COURT: In looking at the charges against you, Mr. McBride, and the complexity of this case, this is not an ordinary - - this isn't some fender bender accident?
>
> MCBRIDE: Exactly, sir.
>
> . . .
>
> THE COURT: At least in the opinion of the Court, you would receive a far better defense if you would proceed with a lawyer, rather than being on your own. And I think it is

unwise for you to try and represent yourself. And while you are familiar with the law, you are not familiar to the depth that would be necessary to give yourself the best possible defense, considering the complexity of what you are charged with.

MCBRIDE:    I understand.

THE COURT: And while you have been in a court proceeding or maybe more than one, different things come up at different proceedings that you may never have seen or heard of before. . . . And you have at your elbow there someone who has had many years of experience in this and other courts and would be termed probably an expert on federal trial work.

Let me ask you this, Mr. McBride. Is your decision entirely voluntary on your part?

MCBRIDE:    Yes, sir.

The district court then concluded that McBride had knowingly and voluntarily waived his right to counsel, that he was competent to do so, and that he had demonstrated an understanding of the proceedings and the charges he faced. Graeff was nonetheless requested by the court to continue in his role as standby counsel.

McBride represented himself throughout his trial with the assistance of Graeff. The jury found him guilty on all counts. At sentencing, McBride raised no objections to the Presentence Report and used the hearing to state his view that the district court and the U.S. Attorney's Office were engaged in fraudulent "smoke and mirrors" accounting practices. The district court *sua sponte* raised concerns about the probation officer's determination that McBride should be sentenced

under the United States Sentencing Guidelines in accordance with Offense Level 26, Criminal History Category IV, within a range of 92-115 months of imprisonment. It decided that McBride should instead be sentenced under Offense Level 22, Criminal History Category IV. The court then sentenced McBride to 78 months of imprisonment on Count 2; 60 months on Counts 1, 4, 5, and 6; and 36 months on Count 3, all to be served concurrently.

## II. ANALYSIS

### A.  McBride knowingly and intelligently waived his right to counsel

#### 1. *Standard of review*

McBride argues on appeal that he did not effectively waive his right to counsel at trial or at sentencing. Both parties agree that the standard of review for such claims is de novo, but neither party provides any citations to applicable Sixth Circuit precedent directly on point. Our sister circuits uniformly apply a de novo standard of review to a district court's conclusion of law that a defendant has waived his right to counsel. *See, e.g., United States v. Kimball*, 291 F.3d 726, 730 (11th Cir. 2002); *United States v. Turner*, 287 F.3d 980, 983 (10th Cir. 2002); *Lopez v. Thompson*, 202 F.3d 1110, 1116 (9th Cir. 2000) (en banc).

In this circuit, however, two trends have developed. We have on occasion applied "plain error" review to examine the validity of a defendant's waiver of counsel. *See United States v. Modena*, 302 F.3d 626, 630-31 (6th Cir. 2002) (holding that the plain error standard applies where the defendant fails to object to continuing his self-representation); *United States v. Herrera-Martinez*, 985 F.2d 298, 301 (6th Cir. 1993) (holding that because no specific objection was made at trial to the defendant's proceeding *pro se*, the plain error standard applied).

Other panels have approached the waiver-of-counsel issue by omitting discussion of the standard of review and proceeding to engage in a thorough review of the colloquy between the district court judge and the defendant. *See, e.g., United States v. Colbert*, No. 00-1481, 2002 WL 31873484, at *3 (6th Cir. Feb. 12, 2002) (unpublished opinion) (reviewing the hearing transcript to determine whether the judge conducted the model inquiry); *Noble v. Wilkinson*, No. 92-4121, 1993 WL 436850, at *1 (6th Cir. Oct. 27, 1993) (unpublished opinion) (*"When reviewing on direct appeal a claim of error regarding a waiver of counsel, we examine the substantive, detailed inquiry required of the district court pursuant to *United States v. McDowell"*) (citation omitted); *United States v. Miller*, 910 F.2d 1321, 1324 & n.3 (6th Cir. 1990) (reproducing the colloquy and holding that it constituted an effective waiver).

Because the result in this case would be the same under either plain error or de novo review, we have no need to resolve the ambiguity created by the above cases. Instead, we will proceed to examine the district court's colloquy to determine whether McBride made an effective waiver of his right to counsel.

### 2. McBride's waiver of counsel at trial

Before a criminal defendant may represent himself at trial, he must knowingly and intelligently waive his right to counsel. *Faretta v. California*, 422 U.S. 806, 835 (1975) ("[H]e should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open.") (citation and quotation marks omitted). Whenever a district court in the Sixth Circuit is faced with an accused who wishes to represent himself, the court must ask the defendant a series of questions drawn from, or substantially similar to, the model inquiry set forth in the *Bench Book for United States District Judges*. *United States v. McDowell*, 814 F.2d 245, 250 (6th Cir. 1987); *see*

*also Miller*, 910 F.2d at 1324 (holding that literal adherence to the recommended battery of questions is not required). After the questioning, the district court should make an express finding on the record that the accused has knowingly and voluntarily waived his right to counsel. *McDowell*, 814 F.2d at 250.

The model inquiry encompasses thirteen questions and one strongly worded admonishment. In the present case, the district court asked McBride, verbatim, twelve of the thirteen questions, and delivered the requisite warning. The only question that was not specifically asked was the following:

Now, in light of the penalty that you might suffer if you are found guilty and in light of all the difficulties of representing yourself, is it still your desire to represent yourself and to give up your right to be represented by a lawyer?

*Id*. at 252. But the court substantially complied with the essence of this inquiry when it reviewed the maximum penalty for each count that McBride faced, asked McBride whether he realized the jeopardy he was in, and informed him that he would be on his own if he chose to represent himself. The court also advised McBride that his case was complex and would be better handled by his standby counsel, who was an expert at federal trial work.

After the lengthy colloquy with McBride, the district court asked McBride whether his decision to represent himself was "entirely voluntary" and, based upon McBride's affirmative response, made the following finding:

The Court finds that the defendant has knowingly and voluntarily waived his right to counsel. The Court also finds the defendant is competent to waive his right, as he has demonstrated an understanding of the proceedings and the factual allegations against him, and I will permit you to represent yourself.

Because the district court substantially adhered to the model inquiry as prescribed by *McDowell*, we affirm the court's conclusion that McBride knowingly and voluntarily waived his right to counsel at trial.

### 3. McBride's waiver of counsel at sentencing

McBride next argues that the district court should have obtained a second, independent waiver of his right to counsel at the sentencing phase. The "plain error" standard of review is appropriate for this contention because, at the start of the sentencing proceeding, McBride could have objected to continuing his self-representation. He in fact failed to do so. *See United States v. Modena*, 302 F.3d at 630-31. "Plain error is defined as an egregious error, one that directly leads to a miscarriage of justice, or error that is obvious, affects substantial rights, and seriously impairs the fairness or integrity of the judicial proceedings." *United States v. Camejo*, 333 F.3d 669, 672 (6th Cir. 2003) (citation and quotation marks omitted).

In an unpublished opinion, this court has held that "[t]he elaborate waiver procedure outlined in *McDowell* does not apply to waiver of counsel during sentencing. The dangers of self-representation at trial are simply not present at sentencing." *United States v. Napier*, Nos. 88-164, 88-1693, 88-1763, 88-1765, and 88-1766, 1989 WL 100865, at *5 (6th Cir. Sept. 1, 1989). We need not decide whether this is a correct holding in the present case. The issue here is the narrower one of whether a defendant's waiver of counsel at trial carries over to the sentencing phase. Other circuits have held that a valid waiver remains in effect at subsequent proceedings in the absence of an explicit revocation by the defendant or a change of circumstances that would suggest that the district court should make a renewed inquiry of the defendant. *See, e.g., United States v. Unger*, 915 F.3d 759, 762 (1st Cir. 1990) (holding that the district court was free to find that the defendant's earlier waiver was still in force at the sentencing hearing in the absence of intervening events);

*United States v. Fazzini,* 871 F.2d 635, 643 (7th Cir. 1989) ("Once the defendant has knowingly and intelligently waived his right to counsel, only a substantial change in circumstances will require the district court to inquire whether the defendant wishes to revoke his earlier waiver."); *Arnold v. United States*, 414 F.2d 1056, 1059 (9th Cir. 1969) (holding that, after a competent waiver of the right to counsel, a new waiver need not be obtained at every subsequent court appearance of the defendant); *Davis v. United States*, 226 F.2d 834, 840 (8th Cir. 1955) (same).

This court has held, in a somewhat analogous situation, that where a magistrate judge has engaged in the *McDowell* colloquy with the defendant and found an effective waiver, the district judge is under no obligation to repeat the inquiry at trial in the absence of any indication from the defendant that he has had a change of heart. *Modena*, 302 F.3d at 631. Both *Modena* and *Napier* lead us to adopt the rule set forth above by our sister circuits that a defendant's waiver of counsel at trial carries over to subsequent proceedings absent a substantial change in circumstances. Because we find the rule to be a sound one, we adopt it as part of this circuit's jurisprudence.

McBride's behavior at the sentencing hearing also sheds light on the continuing validity of his waiver of counsel. *See United States v. Gangler*, No. 95-2406, 1997 WL 618783, at *2 (6th Cir. Oct. 6, 1997) (unpublished opinion) (holding that "waiver can be inferred from a defendant's actions") (citation omitted). At sentencing, the district court first asked McBride's standby counsel if he believed that McBride understood the Presentence Report. After receiving an affirmative response, the court asked for any objections to the report, resulting in the following exchange:

THE COURT: Mr. McBride, do you wish to have [standby counsel] say anything on your behalf?

MCBRIDE:      May I speak on my own behalf?

THE COURT:   You may speak on your own behalf, but please answer the question I asked you. I just asked you, do you wish to have [standby counsel] speak?

MCBRIDE:      I only wish to speak on my own behalf.

THE COURT:   Okay. So, the answer is no? You may speak on your own behalf.

McBride's conduct at sentencing demonstrates that he did not wish to revoke his previous waiver of counsel. He refused to let his standby counsel speak on his behalf to voice any objections to the Presentence Report. Because nothing occurred between trial and sentencing that would have prompted the district court to make a more thorough inquiry of McBride's wish to continue to represent himself, we reject McBride's claim that his waiver of counsel at trial was not in force at the sentencing hearing.

**B.    The district court had no duty to assist McBride in the conduct of his own defense**

McBride also argues that the district court should have informed him that he had a right to bring a Rule 29 motion for a judgment of acquittal either at the close of the government's evidence or after the close of all the evidence. Fed. R. Crim. Proc. 29. The Supreme Court, however, has made clear that "[a] defendant does not have a constitutional right to receive personal instruction from the trial judge on courtroom procedure." *McKaskle v. Wiggins*, 465 U.S. 168, 183 (1984). "Nor does the Constitution require judges to take over chores for a *pro se* defendant that would normally be attended to by trained counsel as a matter of course." *Id.*

In the present case, the district court explicitly told McBride that it would be unable to assist him in the conduct of the trial:

THE COURT:   I cannot tell you how to try your case. I can keep everyone, including the prosecutor under a certain amount of control, but I can't tell you what to do or when to do it.

MCBRIDE:      Right.

THE COURT:   And I can't question witnesses for you or cross-examine them or give you a word of advice. The Court desires to be and is, neutral in this and in every other case.

MCBRIDE:      I understand.

THE COURT:   I will not provide you with personal instruction on courtroom procedure or perform any legal duties that counsel would normally carry out.

The court then inquired whether McBride was familiar with both the Federal Rules of Evidence and the Federal Rules of Criminal Procedure, to which McBride answered in the affirmative. Under these circumstances, we find McBride's contention that the district court had a duty to suggest that he make a Rule 29 motion to be without merit.

**C.    Sufficient evidence supports McBride's conviction on Counts 2-5, but not on Count 1**

McBride next argues that the evidence was insufficient to sustain the jury's guilty verdict on the five counts that he contests. In order to appeal a jury's verdict on the basis of insufficient evidence, the defendant must have moved for acquittal in the district court pursuant to Rule 29. *United States v. Charles*, 138 F.3d 257, 265 (6th Cir. 1998).

McBride made no such motion. Because of this failure, the evidence against McBride is reviewed under a "manifest miscarriage of justice" standard and "we only reverse a conviction if the record is devoid of evidence pointing to guilt." *United States v. Carnes*, 309 F.3d 950, 956 (6th Cir. 2002) (citation and quotation marks omitted).

In McBride's brief, he appears at first glance to question the sufficiency of the evidence only for Counts 3-5. But embedded in his discussion of his waiver of the right to counsel is a challenge to the sufficiency of the evidence for his conviction on Counts 1 and 2 as well. McBride concedes that there was sufficient evidence to convict him on Count 6. We will therefore address below the sufficiency of the evidence for Counts 1-5 solely to determine if the record is so devoid of evidence pointing to guilt as to constitute a miscarriage of justice. *Carnes*, 309 F.3d at 956.

### 1. Count 1: false claim against the government

The jury found McBride guilty of presenting a false claim against the government, in violation of 18 U.S.C. § 287, because he sent a governmental agency, the IRS, a bad check to cover the outstanding tax liability of Kefalos. Section 287 provides in pertinent part as follows:

> Whoever makes or presents to any . . . department or agency . . . any claim upon or against the United States, or any department or agency thereof, knowing such claim to be false, fictitious, or fraudulent, shall be imprisoned not more than five years and shall be subject to a fine
> . . . .

The word "claim" is not defined in the statute. Typical § 287 cases in this circuit have involved the filing of a false tax return seeking an unjustified tax refund, *see, e.g., United States v. Nash*, 175 F.3d 429 (6th Cir. 1999), or the filing of a fraudulent claim for Medicare reimbursement for services that were never rendered, *see, e.g., United States v. Campbell*,

845 F.2d 1374 (6th Cir. 1988). In both of these situations the defendant is using fraudulent means to secure an unjustified monetary payment from the government. McBride, on the other hand, convincingly argues that he cannot fall within the ambit of this statutory provision because, by sending the IRS a bad check for Kefalos's outstanding tax obligation, he could not possibly have obtained any money, property, credit, or reimbursement from the government in return.

The government devotes only three sentences to McBride's contention in its brief. Its position is essentially that "the presentation of the claim, in this case the bad check, with the knowledge that it is false, . . . comprises the offense." But no authority was cited to support its contention, and we have found none. One of the citations that the government did provide on this issue actually confirms the plain-meaning understanding of § 287, which does not cover McBride's conduct. *See United States v. Miller*, 545 F.2d 1204, 1212 n.10 (9th Cir. 1976) (observing that the filing of a false tax return pursuant to a scheme to obtain an unjustified tax refund constitutes a false claim under § 287) (citation omitted).

Another case relied upon by the government is *United States v. Jackson*, 845 F.2d 880 (9th Cir. 1988), cited for the proposition that § 287 covers situations where the defendant seeks a "reduction in liability from the government." *Id.* at 882. The facts in *Jackson*, however, do not support the government's position in the case before us. In *Jackson*, the defendant received and cashed nine educational benefits checks from the Veterans Administration (VA) for which he was later found ineligible. *Id.* at 881. With the knowledge that he was both ineligible for the benefits and that he had already deposited the checks, Jackson submitted a claim form to the VA stating he had never received the checks and requesting that they be reissued to him. *Id.*

In analyzing the meaning of a false "claim," the *Jackson* court stated that the "focus must be on the substance of the transaction, *the disbursement of government funds*, and not on

the timing or form of the entry in the government's accounting ledgers." *Id*. at 882 (emphasis added). The court held that Jackson's conduct fell within the ambit of § 287 because, by denying that he had received the first set of checks, Jackson sought to avoid reimbursing the government. *Id.*; *see also United States v. Duncan*, 816 F.2d 153, 155 (4th Cir. 1987) (holding that submitting a false travel voucher to obtain credit for previously advanced government funds constitutes a false claim because the government is at risk of suffering a monetary loss).

*Jackson* is easily distinguishable from the present case. The defendant in *Jackson* did two things that involved the disbursement of government funds. He first sought to reduce his liability to the government in the sense that he attempted to avoid refunding to the government the VA payments that he had received but to which he was not entitled. Second, he made a false claim upon the government by requesting that these checks be reissued to him. Nothing McBride did, on the other hand, involved the disbursement of government funds. He neither received any undue payments from the government nor tried to induce the government to send him duplicate payments. McBride simply sent the IRS a bad check in purported payment of his girlfriend's tax liability.

The closest case that we have found to the one before us is *United States v. Morgan*, 3 Fed. Appx. 633, 2001 WL 123838 (9th Cir. Feb. 12, 2001) (unpublished opinion). In *Morgan*, the Ninth Circuit affirmed the defendant's conviction under § 287 where she "sought both to pay her tax liability and to obtain a refund based on lien drafts that she knew to be false. . . ." *Id*. at 635. We surmise, based on the only other federal case to use the term "lien draft," *United States v. Rudd*, No. 98-30218, 1999 WL 98618 (9th Cir. Feb. 17, 1999) (unpublished opinion), which also originates from the United States District Court in Idaho, that these documents were fictitious comptroller warrants distributed by Leroy Schweitzer, a ringleader of the Freemen of Montana who assisted others in tax evasion. *See United States v. Finley*,

301 F.3d 1000, 1002-3 (9th Cir. 2002) (describing Schweitzer's seminars on the use of fraudulent financial instruments with which to "satisfy" outstanding tax liability and seek unjustified refunds from the IRS); *United States v. Wells*, 163 F.3d 889, 893 (4th Cir. 1998) (same). In the absence of additional information, we will assume for the purposes of analyzing *Morgan* that the false lien drafts were the equivalent of a bad check.

The key factor that distinguishes *Morgan* from McBride's case is that the defendant in *Morgan* sought an unjustified payment from the government—a tax refund. McBride, on the other hand, did not attempt to elicit a payment from the IRS when he sent it a bad check; he was at most, according to his brief, trying to harass the IRS and its agent.

The *Morgan* court considered the defendant's false lien draft as a "claim" because "the government would suffer a monetary loss if she were successful." 3 Fed. Appx. at 635. *Morgan's* concern with the potential loss to the government indicates that the real focus of the court was on the unjustified refund sought by the defendant, because the government's financial position does not change when a proposed payment for taxes owed is returned for insufficient funds; the tax liability remains outstanding both before and after the bad check or false lien draft is tendered.

The unpublished *Morgan* opinion has little independent reasoning, relying on *Jackson* for the proposition that a "'claim' includes seeking a reduction in liability to the government." *Id*. This phrase—"seeking a reduction in liability to the government"—is taken out of context. As we have already pointed out, the defendant in *Jackson* had received prior VA payments from the government for which he was ineligible and for which he was seeking replacement checks. There is a significant difference between filing a form to deceive the government about funds that have been advanced and to which one is not entitled, as occurred in *Jackson*, and simply sending a bad check to purportedly

"cover" a person's tax liability. Similarly, there is a big difference between McBride's conduct, which had no potential for causing any payment to emanate from the government, and the *Morgan* lien drafts whose very purpose was to obtain an unjustified tax refund. Because the reasoning of *Morgan* is unpersuasive and not even a permissible citation in its own circuit, *see* U.S. Ct. of App. 9th Cir. Rule 36-3, we decline to apply it to the present case.

Our decision on this issue would have been greatly simplified if § 287 had defined the word "claim," but it does not. "When the text of a statute contains an undefined term, that term receives its ordinary and natural meaning." *The Limited, Inc. v. Comm'r of Internal Revenue*, 286 F.3d 324, 332 (6th Cir. 2002). The leading law dictionary defines a "claim" as a "[d]emand for money or property as of right." BLACK'S LAW DICTIONARY 247 (6th ed. 1990). Even more on point, the False Claims Act, 31 U.S.C. §§ 3729-3733, the civil counterpart to § 287, defines a "claim" as

> *any request or demand*, whether under a contract or otherwise, *for money or property* which is made to a contractor, grantee, or other recipient *if the United States Government provides any portion of the money or property which is requested or demanded*, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

31 U.S.C. § 3729(c) (emphasis added).

Both definitions reaffirm the prevailing understanding in this circuit that a "false claim" for the purposes of § 287 is an unjustified demand for money or property from the government. *See United States v. Logan*, 250 F.3d 350, 357-59 (6th Cir. 2001) (affirming a §287 conviction for filing forms to induce the government to pay on false HUD/FHA loan insurance claims); *Nash*, 175 F.3d at 436-37 (affirming a § 287 conviction for filing fictitious tax returns to obtain

unjustified refunds); *United States v. Hebeka*, 25 F.3d 287, 289, 292 (6th Cir. 1994) (affirming a § 287 conviction for making an unjustified request to the government for redemption of $7.2 million worth of food stamps); *Campbell*, 845 F.2d at 1381-83 (affirming a § 287 conviction for billing the government's Medicare program for unperformed medical services). Because "any ambiguity in criminal statutes [is] resolved against the government and in favor of the criminal defendant," *United States v. Jolivette*, 257 F.3d 581, 584 (6th Cir. 2001), we are loath to adopt a meaning of "false claim" that is contrary to both the plain meaning of the term and our circuit's precedent.

After scouring the federal case law, we can find no case holding that the sending of an insufficient-funds check to the IRS constitutes a false claim under § 287. We decline, for all the reasons set forth above, to be the first court to do so. Because McBride never received any advance payments from the government to which he was not entitled, nor could his action of sending the IRS a bad check have possibly elicited any payment from the government, he cannot, as a matter of law, be found liable under § 287. We therefore reverse McBride's conviction on Count 1.

### 2. Count 2: impeding the administration of justice

The jury convicted McBride of corruptly endeavoring to influence, intimidate, or impede the administration of justice, in violation of 18 U.S.C. § 1503. To sustain a conviction under this section, the government must prove that McBride acted with the intent to influence, in the sense of interfering with, judicial proceedings. *United States v. Atkin*, 107 F.3d 1213, 1218 (6th Cir. 1997). A defendant must "undertake action from which an obstruction of justice was a reasonably foreseeable result," but he need not be successful in his endeavor. *Id.* (quotation marks omitted).

In *United States v. Fleming*, 215 F.3d 930, 933-38 (9th Cir. 2000), the Ninth Circuit affirmed the conviction of a

defendant who attempted to file a $10 million dollar lien on real property owned by the judge who had dismissed the defendant's civil case. Although the lien was never filed, the defendant's conduct was considered an attempt to influence or intimidate the judge, in violation of § 1503. Similar circumstances are presented here. McBride filed a fraudulent involuntary bankruptcy petition against Judge Marbley, the district judge presiding over Kefalos's trial, in the period between her conviction and sentencing. He admitted at his trial that he filed the petition in response to what he perceived as "injustices" in the Kefalos trial. A reasonable jury could find that McBride acted with the intent to intimidate Judge Marbley as the latter prepared to sentence Kefalos, even though McBride was unlikely to be successful. We see no miscarriage of justice in affirming McBride's conviction on Count 2.

### 3. Count 3: impeding the administration of the IRS

McBride was convicted of corruptly endeavoring to obstruct or impede the administration of the internal revenue laws, in violation of 26 U.S.C. § 7212(a). "[T]o act corruptly means to act with the intent to secure an unlawful benefit either for oneself or another." *United States v. Winchell*, 129 F.3d 1093, 1098 (10th Cir. 1997) (collecting cases). The defendant must also be acting in response to "some pending IRS action of which [he is] aware." *United States v. Kassouf*, 144 F.3d 952, 957 (6th Cir. 1998).

McBride filed a fraudulent petition to place Nypaver, the IRS revenue agent assigned to Kefalos's case, into involuntary bankruptcy. Although Kefalos had already been convicted of tax evasion when McBride filed the petition, the IRS still had a pending claim against Kefalos of which McBride was aware. A reasonable jury could find that McBride's filing of a false petition against Nypaver was intended to intimidate Nypaver or otherwise interfere with the revenue agent's efforts to collect the unpaid taxes from Kefalos. *See, e.g., United States v. Rosnow*, 977 F.2d 399,

410 (8th Cir. 1992) (holding that the filing of a false federal tort claim against an IRS agent was sufficient evidence to allow a jury to conclude that the defendant intended to impede the administration of the internal revenue laws under 26 U.S.C. § 7212(a)); *United States v. Reeves*, 752 F.2d 995, 1001-02 (5th Cir. 1985) (holding that the defendant's filing of frivolous common law liens against an IRS agent constituted a prohibited corrupt endeavor under 26 U.S.C. § 7212(a)). We see no miscarriage of justice in affirming the jury's verdict on Count 3.

### 4. Counts 4 and 5: bankruptcy fraud

The jury convicted McBride of devising or intending to devise a scheme to defraud Kefalos's two defense attorneys, Axelrod and Sherman, in violation of 18 U.S.C. § 157. Section 157 "contains three elements: 1) the existence of a scheme to defraud or intent to later formulate a scheme to defraud and 2) the filing of a bankruptcy petition 3) for the purpose of executing or attempting to execute the scheme." *United States v. DeSantis*, 237 F.3d 607, 613 (6th Cir. 2001). Filing the petition "itself is the forbidden act. . . . Success of the scheme is not an element of the crime." *Id*.

McBride does not dispute that he filed false involuntary bankruptcy petitions against Axelrod and Sherman. Attached to the petitions were official acknowledgments from the Franklin County Treasurer's Office showing that McBride had purportedly paid the real estate taxes on Axelrod's and Sherman's residences for the first half of 2001, thus making McBride one of their creditors. A reasonable jury could find that McBride's actions evidenced an intent to defraud them of their property. "The statute makes the crime complete upon the *filing* of the bankruptcy petition" as long as the scheme or intent to formulate the scheme exists. *Id*. (emphasis in original). Under the circumstances of this case, we see no miscarriage of justice in affirming McBride's conviction on Counts 4 and 5.

**D. McBride's sentence**

Embedded in McBride's claim that he did not waive his right to counsel at sentencing is a separate complaint about the district court's calculation of loss to the victims. But McBride made no objection to the Presentence Report's calculation of loss at his sentencing hearing. "[A]bsent plain error, this Court will not address claims of alleged misapplication of the [sentencing] guidelines unless the defendant first raised the claim before the district court." *United States v. Thomas*, 24 F.3d 829, 832 (6th Cir. 1994).

U.S. Sentencing Guidelines § 2B1.1, which addresses offenses involving fraud and deceit, establishes the sentencing range for Counts 1, 4, 5, and 6. By operation of the rules for aggregating multiple counts, the offense level for the latter counts also determines the sentencing range for Counts 2 and 3. U.S. Sentencing Guidelines Manual ch. 3, pt. D (2003). A decision to vacate McBride's sentence for Counts 1, 4, 5, and 6 would therefore require remand and resentencing on all of the counts.

Determination of the offense level under § 2B1.1 depends on the amount of loss caused or intended by the defendant. The Application Note to this section provides as follows:

> "Intended loss" (I) means the pecuniary harm that was intended to result from the offense; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value).

U.S. Sentencing Guidelines Manual § 2B1.1, cmt. n. 3 (2003). In the Presentence Report, the probation officer estimated the total intended loss at $1,139,760.67, which represented the sum of the bad checks written by McBride to the IRS ($12,990.67) and to the bankruptcy court ($800), plus the total market value of the residences of Judge Marbley,

attorneys Sherman and Axelrod, and agent Nypaver ($1,125,970). The market value of these individuals' residences was included because had McBride been successful in forcing his victims into involuntary bankruptcy, he could have obtained a creditor's interest in their property. Even though McBride would never have succeeded in obtaining possession of his victims' residences, the district court nonetheless felt obliged to use the residences' value because intended loss is defined as including "harm that would have been impossible or unlikely to occur." The U.S. Sentencing Guidelines provide that where the cumulative loss exceeds $1 million, the court should increase the base offense level of 6 by 16 levels.

Because it was highly improbable that McBride intended, or would have been able, to obtain ownership of these residences, the district court was troubled by the inclusion of the full value of each victim's home in the loss calculation. But the district court concluded that Amendment 617 to the U.S. Sentencing Guidelines, which clarified that "intended loss" included unlikely or impossible losses, effectively overruled the Sixth Circuit's practice of vacating sentences where "the total intended loss bore no relation to 'economic reality,' . . . because . . . the plan had no chance of success." *United States v. Fleming*, 128 F.3d 285, 288 (6th Cir. 1997) (collecting cases); *see also United States v. Watkins*, 994 F.2d 1192, 1196 (6th Cir. 1993) (holding that a defendant "may not be sentenced on the basis of harm that he or she was incapable of inflicting").

The district court nonetheless decided that there were many variables that can affect a residence's market value and, "out of an abundance of caution," *sua sponte* reduced the probation officer's loss figure by 15 percent. This reduced the total loss that McBride intended to inflict to $970,865.17. McBride's base offense level was thus increased by 14, rather than 16, levels.

On appeal, McBride argues for the first time that the district court misapplied § 2B1.1. He contends that he did not actually intend to acquire his victims' homes, but rather only intended to harass the individuals. McBride correctly notes that pecuniary harm does not include emotional distress. U.S. Sentencing Guidelines Manual § 2B1.1., cmt. n.3. He therefore contends that the intended loss was at most only $800, which is the sum of the four filing fees paid with bad checks to the bankruptcy court.

The district court properly recognized that Amendment 617 resolved a circuit split regarding the meaning of "intended loss" by clarifying that the definition reached "unlikely or impossible losses . . . because their inclusion better reflects the culpability of the offender." U.S. Sentencing Guidelines Manual app. C. at 181 (2003). We have previously acknowledged that "the amendments abandon this circuit's interpretation of intended loss . . . ." *United States v. Anderson*, 353 F.3d 490, 505 n.13 (6th Cir. 2003). On the other hand, there is surely some point at which a perpetrator's misperception of the facts may become so irrational that the words "intended loss" can no longer reasonably apply. For instance, if someone vandalized a federal building by spray painting an incantation that all government gold shall disappear, the "intended loss" would presumably not be the value of all the gold in Fort Knox, even if the vandal genuinely believed that all the gold would disappear.

McBride's actions in the case before us, however, do not rise to that level of irrationality. The probation officer's calculation of intended loss thus appropriately included the total market value of the residences of McBride's victims, despite the fact that McBride could never have caused them to lose their homes. But that is not the end of the matter.

Application Note 18(C) to § 2B1.1 provides: "There may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be

warranted." The Sentencing Commission has provided no further guidance regarding the application of this downward departure. We agree, however, with the observation by one district court that "[b]ecause the loss determination essentially dictates the severity of the sentence, it is this determination that will almost always be the subject of departure scrutiny." *United States v. Roen*, 279 F. Supp. 2d 986, 990 (E.D. Wisc. 2003).

The *Roen* court described four scenarios in which a loss determination may significantly overstate the severity of the offense. *Id*. at 990-91 Only one concerns us here. Where sentencing is based largely or solely on intended loss, a downward departure may be warranted under the "economic reality" principle. *Id.* at 991; *see also United States v. Stockheimer*, 157 F.3d 1082, 1089 (7th Cir. 1998) (same). The underlying theory behind this principle is that "where a defendant devises an ambitious scheme obviously doomed to fail and which causes little or no actual loss, it may be unfair to sentence based on the intended (but highly improbable) loss determination from the [§ 2B1.1] table." *United States v. Forchette*, 220 F. Supp. 2d 914, 924-25 (E.D. Wisc. 2002).

A court should therefore consider "whether there was any reasonable possibility that the scheme could have caused the loss the defendant intended." *Roen*, 279 F. Supp. 2d at 991. This is so because the Sentencing Commission is using intended loss as a proxy for the defendant's degree of culpability. U.S. Sentencing Guidelines § 2B1.1 cmt. background (stating that "loss serves as a measure of . . . the defendant's relative culpability"). The *Roen* court persuasively pointed out that

> [t]hose who devise ridiculous schemes (1) do not ordinarily have the same mental state and (2) do not create the same risk of harm as those who devise cunning schemes. In short, they are not as dangerous. Thus, it is entirely proper to mitigate their sentences by a departure.

*Roen*, 279 F. Supp. 2d at 991.

In *Roen*, the defendant had a life insurance policy valued at approximately $9,700. He induced the insurance company to issue him loans against the policy, which he "repaid" by writing checks drawn on a closed account. Defendant's scheme cost the insurance company approximately $19,000. *Id*. at 986. But the defendant wrote other bad checks, to the tune of $1.2 million, for various high-priced items. None of the recipients of the checks provided defendant with any goods or services. *Id*. at 987. According to the Presentence Report, the total loss was approximately $1.26 million—the sum of the actual loss to the insurance company and the intended loss based on the other bad checks. *Id*. For losses over $1 million, § 2B1.1 dictates a 16-level enhancement to the base offense level of 6. Roen's total offense level was thus placed at 22 in the Presentence Report. *Id*. at 987.

Because Roen's scheme was not so improbable as to defeat a finding of intent, the court in *Roen* accepted Offense Level 22 as the starting point for sentencing. *Id*. at 989. But the court determined that a downward departure was necessary because there was no reasonable possibility that Roen's scheme could have caused over a million dollars in losses. *Id*. at 992.

The *Roen* court also discussed a second measure of the economic reality of the intended harm: "the variance between the intended loss and the realistic possibility of such a loss." *Id*. at 991 (citing *Stockheimer*,157 F.3d at 1091). "Of course, the best evidence of a scheme's probable success is its actual success." *Roen*, 279 F. Supp. 2d at 991. In *Roen*, the court held that "the discrepancy between the actual loss—$19,000—and the intended loss—over $1.2 million— was extreme." *Id*. at 992. Because of this disparity, the court concluded that a downward departure was warranted. *Id*.; *see also Stockheimer*, 157 F.3d at 1090-92 (holding that where it was highly unlikely that the intended loss would have reached

$80 million and the actual loss was only $200,000, a downward departure was warranted).

The quixotic nature of McBride's activities had far less chance of success than the defendant's scheme in *Roen*. Conceivably, in *Roen*, a vendor could have provided the defendant with goods or services before realizing that the check was drawn on a closed account, thereby triggering actual losses. In McBride's case, it defies common sense to believe that McBride would have succeeded in forcing Judge Marbley, attorneys Axelrod and Sherman, and agent Nypaver into involuntary bankruptcy and thereby obtained possession of their residences.

The disparity between the presumed actual loss of $800 (as measured by the bad checks actually deposited by the bankruptcy court in payment of filing fees) and the intended loss of $1,139,760.67 is also far greater in McBride's case—a ratio of 1:1425— than the disparity in *Roen* (1:67) and *Stockheimer* (1:400). We conclude that the impossibility that McBride's scheme would succeed and the gross disparity between the actual loss and the intended loss demonstrate that there is a significant risk that "the offense level determined under this guideline substantially overstates the seriousness of the offense. . . [and] a downward departure may be warranted." U.S. Sentencing Guidelines Manual § 2B1.1, cmt. 18(C); *see also United States v. Coffman*, 94 F.3d 330, 336-337 (7th Cir. 1996) (applying the economic reality principle in considering a downward departure under §2B1.1).

Despite our conclusion on the merits of this issue, we recognize the general rule that "a court's failure to . . . grant a downward departure is not reviewable." *United States v. Coleman*, 188 F.3d 354, 357 (6th Cir. 1999) (en banc). We will review a failure to depart, however, "if the district court judge incorrectly believed that he lacked any authority to consider defendant's mitigating circumstances as well as the discretion to deviate from the guidelines." *Id*. (citation omitted). In such circumstances, we will vacate the

defendant's sentence and remand for reconsideration. *United States v. Truman*, 304 F.3d 586, 589 (6th Cir. 2002).

To determine whether the district judge believed that there was no authority to depart, we review the sentencing hearing transcript. *United States v. Ebolum*, 72 F.3d 35, 37 (6th Cir. 1995). Omission from the Presentence Report of any discussion concerning an applicable downward departure may also suggest that the court was not aware of its ability to depart. *United States v. Hall*, 71 F.3d 569, 573 (6th Cir. 1995) (holding that the failure of the Presentence Report and the district court to consider the applicability of a particular downward-departure provision, given defendant's circumstances, indicated that the court was not aware of its discretion to depart).

We typically invoke the above standards when a defendant has made a motion for a downward departure that was rejected by the district court. Here, McBride neither objected to the Presentence Report nor made a motion for a downward departure. The court's failure to consider *sua sponte* a downward departure must therefore rise to the level of plain error before we will consider granting any relief to McBride.

An examination of the sentencing transcript indicates that the district court was predisposed to reducing McBride's offense level. The court "question[ed] the appropriateness of including the value of each victim's home in the loss calculation," recognizing that it did not fit with longstanding Sixth Circuit practice to "limit[] intended loss to harms the defendant was actually capable of inflicting." But the court assented to the use of the value of the victims' homes because Sentencing Guidelines "Amendment [617] resolved . . . the application of the economic reality test, and in effect, *prohibited the use of this doctrine under the Sentencing Guidelines*." (Emphasis added.) Although Amendment 617 did bar the court from applying the economic reality principle when calculating "intended loss," there is no basis for the district court's conclusion that the test was categorically

prohibited under the Sentencing Guidelines. The implication is that the court was unaware that it could apply the economic reality principle in considering a downward departure.

There is additional evidence to suggest that the district court wanted to depart but did not recognize that it could do so. First, the court found another way to decrease McBride's offense level when it reduced the intended loss figure by 15 percent because "too many variables exist in determining the fair market value of the victims' homes to use the probation officer's calculations." The court thus did depart, albeit in a nontraditional manner. Second, the Presentence Report contains no discussion of the circumstances in McBride's case that might have warranted a downward departure. The probation officer in fact recommended *enhancing* McBride's offense level for misrepresentation during a bankruptcy proceeding and obstruction of justice. Both of these recommendations were rejected by the district court.

The sentencing proceedings strongly suggest that the district court was disposed to depart downward from the initial offense level but, because it erroneously believed that the economic reality principle was completely discredited, it did not invoke the principle in considering a downward departure. We are mindful, however, that we are reviewing McBride's sentence under the plain error standard because he failed to object to the Presentence Report and failed to make a motion for a downward departure.

Both the D.C. and Seventh Circuits have held that plain error may be shown where a defendant fails to make the appropriate objections or motions *and* the record indicates that the district court erroneously believed that it lacked the authority to depart on a particular ground. *See United States v. Draffin*, 286 F.3d 606, 610 (D.C. Cir. 2002) (concluding that plain error may lie, notwithstanding defendant's silence, where the sentencing court makes plain that it is choosing not to depart on a particular ground because of the mistaken belief that it lacks the authority to do so); *United States v.*

*Stockheimer*, 157 F.3d 1082, 1091 (7th Cir. 1998) (holding that even where defendants fail to make a motion for a downward departure, plain error may be shown where "the district court has both a substantive basis and an inclination to consider a downward departure").

*Stockheimer* is of particular relevance because, like McBride, the defendants in that case were sentenced under § 2B1.1 and the estimated intended loss significantly overstated the seriousness of the actual fraud committed. 153 F.3d at 1089-90. Because the defendants failed to make a motion for a downward departure, the Seventh Circuit applied plain error review to this issue. *Id*. at 1091.

Reviewing the sentencing hearing transcript, the *Stockheimer* court concluded that the district court erroneously decided that circuit precedent barring consideration of economic reality when calculating intended loss also barred the principle from being taken into account in considering a downward departure. *Id*. at 1090. This was held to be an error of law. The Seventh Circuit reaffirmed that "the place for mitigation on the basis of a large discrepancy between intended and probable loss is, under the guidelines, in the decision whether to depart downward, rather than in the calculation of the intended loss." *Id*. at 1091 (citation omitted).

We agree with our sister circuit that this court should "not blithely recognize plain error in a sentencing court's decision not to depart downward." *Id*. But, as in *Stockheimer*, the district court below erred in believing that it could not apply the economic reality principle at all, when in fact it remains a valid basis for a downward departure. We therefore adopt the Seventh Circuit's conclusion that the plain error standard is met here because

> the record suggests that the district court had a legal basis and some predilection to depart downward, [so] the error affected [McBride's] substantial rights. . . . [B]ecause of

> the apparently unprecedented magnitude of the discrepancy between the actual and intended loss, we conclude that the error seriously affected the fairness of [McBride's] sentencing proceedings.

*Id*. at 1092. We therefore vacate McBride's sentence and remand to the district court for resentencing.

As a final caveat, we note that even though our opinion "reflect[s] a strong conviction that on the basis of the record, consideration of a downward departure is appropriate, the actual decision is entirely in the hands of the district court." *Id*. The district court has already reduced McBride's offense level by somewhat arbitrarily deflating the intended loss figure. Our point is that this adjustment—and any other appropriate adjustment—should be made through the downward departure mechanism.

### III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** McBride's conviction on Counts 2-6, **REVERSE** his conviction on Count 1, **VACATE** his sentence, and **REMAND** for resentencing consistent with this opinion.