NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0322n.06
No. 19-3290

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jun 03, 2020
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE |
| | ) | SOUTHERN DISTRICT OF |
| CHRISTOPHER MURPHY, | ) | OHIO |
| | ) | |
| Defendant-Appellant. | ) | OPINION |
| | ) | |

BEFORE: ROGERS, STRANCH, and THAPAR, Circuit Judges.

STRANCH, J., delivered the opinion of the court which ROGERS and THAPAR, JJ., joined. THAPAR, J. (pg.12), delivered a separate concurrence. STRANCH, J. (pg. 13), delivered a separate concurrence.

JANE B. STRANCH, Circuit Judge. Christopher Murphy pled guilty to one count of attempt to access without authorization a protected computer for private commercial gain, in violation of 18 U.S.C. § 1030(b). He attempted to pay an employee of the National BiWeekly Administration ("NBA") to help him illegally access NBA's client database. During sentencing, the district court denied Murphy's objection to a 14-level increase to his offense level under the Sentencing Guidelines based on the "intended loss" that he sought to inflict. The district court calculated "intended loss" under the Guidelines commentary definition rather than the statutory definition of "loss" in 18 U.S.C. § 1030(b), and it considered Murphy's intent and culpability in

sentencing. Murphy appeals the district court's application, interpretation, and factual findings in support of the intended loss calculation. We **AFFIRM**.

## I.  BACKGROUND

### A.  Factual Background

Christopher Murphy owned and operated Biweekly Mortgage Association, a business he founded that helped customers make mortgage payments on a bi-weekly, rather than monthly, basis. Murphy was the sole proprietor of the company and claimed that his personal and business expenses were filtered through the company, but he did not have copies of his tax returns or any verification of the company.

The National BiWeekly Administration, Inc. ("NBA") is a similar business based in Xenia, Ohio. NBA assists subscribing homeowners to make timely bi-weekly payments on their mortgages for seven dollars each per month, among other services. NBA has information on over 400,000 people in its database, but only about 135,000 were subscribers to the bi-weekly mortgage payment service. Before 2015, NBA had around 170 employees to service the 135,000 active subscribers, and it collected seven dollars per month from these subscribers. In May 2015, the Consumer Finance Protection Bureau brought a civil suit against NBA for alleged misrepresentations the company made to the 135,000 subscribers. A federal court subsequently enjoined NBA from collecting the monthly fee, and while the appeal to the order was pending, NBA suspended the bi-weekly service completely on November 23, 2015. NBA still considered the 135,000 subscribers its clients because they enrolled in lifetime membership programs and were still in the company's system, but as a result of the injunction and suspension of the program, the number of NBA employees dropped to seven.

When Murphy learned that NBA had suspended its bi-weekly mortgage service, he tried to contact the president of NBA in an alleged attempt to reach an agreement for his company to service NBA's clients. When those efforts failed, Murphy took matters into his own hands to obtain NBA's client information so he could solicit the subscribers.

In September 2017, Murphy approached an NBA employee and offered the employee $14,000 to enter NBA's office, receive an email with malware,[1] and open the email and the attachment so Murphy could gain access to NBA's computer system. Murphy said he would provide a thumb drive for the employee to download the client list from the company's computer system as a backup. On October 2, 2017, Murphy gave the employee, who had become a confidential informant, money and the thumb drive, and he later sent the email with malware. Murphy was arrested that same day.

## B. Procedural History

Murphy pled guilty to one count of attempt to access without authorization a protected computer for private commercial gain in violation of 18 U.S.C. § 1030(b). As part of his Sentencing Guidelines calculation, USSG § 2B1.1(b)(1)(H) dictates a 14-level increase in the offense level if the "loss" from an applicable offense is between $550,000 and $1,500,000. The Presentence Report (PSR) recommended such an increase based on the Government's calculation of the potential loss to NBA, which it pegged at $945,000—135,000 subscribers paying fees for one month at seven dollars each. Based on this calculation and his criminal history and acceptance of responsibility, Murphy's Guidelines range was calculated at 27-33 months.

---

[1] Malware are "[p]rograms written with the intent of being disruptive or damaging to (the user of) a computer or other electronic device." *Malware*, OXFORD ENGLISH DICTIONARY (3d ed. 2016).

The Government argues that this 14-level increase is appropriate based on the pecuniary harm that Murphy reasonably intended, citing Application Note 3 of the Guidelines commentary, which defines loss for the purposes of the Guidelines calculation. Relevant to the present case is the commentary definition of intended loss:

> *"Intended loss"* (I) means the pecuniary harm that the defendant purposely sought to inflict; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur (*e.g.*, as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value).

USSG § 2B1.1 cmt. 3(A)(ii). Even though NBA was not offering its bi-weekly service to the 135,000 subscribers at the time of Murphy's offense, the Government argues that the list had value both to NBA and to Murphy, who offered $14,000 to illegally obtain information on the subscribers to solicit them to purchase the same services from his company.

Murphy objects to the Guidelines range and argues that NBA could not have sustained a loss because NBA was not servicing the clients at the time of the offense. Murphy contends that there was no actual loss, and that any intended loss was highly unlikely to result from a scheme so obviously doomed to failure. Murphy also argues that he did not intend to steal the lists, but believed that NBA was going out of business and wanted to help the clients by providing the same service.

The district court found that while he did not intend to run NBA out of business, Murphy thought NBA was on its last legs and he could build his own business by obtaining its client list illegally. The court found the Government's intended loss calculation to be a reasonable and conservative estimate, because it was not based on all 400,000 customers of NBA but on only the 135,000 who subscribed to the bi-weekly service, and intended loss was computed only for a one-month period.

After engaging in an extensive analysis of the intended loss calculation, the district court denied Murphy's objection to the Guidelines range. It noted that while impossible or unlikely losses are not grounds to reduce the intended loss figure, "one has to consider the economic improbability or impossibility that intended loss, even conservatively stated, even reasonable on its face, could have been achieved." The court found it highly doubtful that Murphy would have been able to sign up many of the 135,000 subscribers for his own business. The economic realities did not render the Guidelines range invalid, but the court varied downward from the Guidelines range of 27-33 months under 18 U.S.C. § 3553(a), because "the intended loss would have been impossible to achieve given the circumstances." [2] Murphy was sentenced to 12 months and one day of imprisonment.

## II.    ANALYSIS

Murphy appeals the district court's denial of his objection to the calculation of the Guidelines range based on the interpretation and calculation of "intended loss." Murphy also argues for the first time on appeal that the definition of "intended loss" in the Guidelines commentary conflicts with the definition of "loss" in the criminal statute under which he was convicted and that following the commentary rather than the statute is a separation of powers violation.

---

[2] The district court noted that the downward variance relates to its denial of the objection on the intended loss calculation. It indicated that it did not depart from the Guidelines because it had the authority to vary from the Guidelines range. The court noted that had the Guidelines been mandatory, before *United States v. Booker*, 543 U.S. 220 (2005), it would have concluded that the intended loss figure of $943,000 overstated the seriousness of the offense based on unique factors in the case, and it would have come up with a reasonable estimation of intended loss such that the enhancement would place the Guidelines range around the length of Murphy's sentence.

A.       **Interpretation and Calculation of Intended Loss**

We "review de novo the district court's method for calculating [loss], and review its factual findings for clear error." *United States v. Maddux*, 917 F.3d 437, 450 (6th Cir. 2019) (citing *United States v. Warshak*, 631 F.3d 266, 328 (6th Cir. 2010)).

USSG § 2B1.1 cmt. 3(A)(ii) is clear that intended loss includes "intended pecuniary harm that would have been impossible or unlikely to occur."  But the impossible or unlikely loss must still be intended, and therefore the district court considered whether loss that is highly unlikely or improbable can still reasonably be intended.  *See United States v. McBride*, 362 F.3d 360, 375 (6th Cir. 2004) ("A court should . . . consider 'whether there was any reasonable possibility that the scheme could have caused the loss the defendant intended' . . . because the Sentencing Commission is using intended loss as a proxy for the defendant's degree of culpability." (quoting *United States v. Roen*, 279 F. Supp. 2d 986, 991 (E.D. Wis. 2003))).

Our court has considered how the intended loss calculation applies in situations where the loss is so high that it is not rooted in reality.  We previously vacated sentences where "the total intended loss bore no relation to 'economic reality,' . . . because . . . the plan had no chance of success." *United States v. Fleming*, 128 F.3d 285, 288 (6th Cir.1997).  In *McBride*, we noted that Amendment 617 from 2001, which added the commentary language in question here, effectively prevented courts from applying the economic reality principle *when calculating intended loss*.  362 F.3d at 374; *see also United States v. Anderson*, 353 F.3d 490, 505 n.13 (6th Cir. 2003).  *McBride* makes clear, however, that "there is surely some point at which a perpetrator's misperception of the facts may become so irrational that the words 'intended loss' can no longer reasonably apply." 362 F.3d at 374.  We concluded that the economic realities test is not categorically prohibited under the Sentencing Guidelines and may be applied when considering a downward departure,

even if it is prohibited when calculating intended loss. *Id.* at 377. We vacated the district court's sentence where it categorically prohibited any application of the test in sentencing because "where a defendant devises an ambitious scheme obviously doomed to fail and which causes little or no actual loss, it may be unfair to sentence based on the intended (but highly improbable) loss determination." *Id.* at 375 (quoting *United States v. Forchette*, 220 F. Supp. 2d 914, 924–25 (E.D. Wis. 2002)).

Here, we do not need to decide when the calculation of intended loss can no longer reasonably apply, because the district court adhered to these principles in granting a downward variance under 18 U.S.C. § 3553(a). It properly recognized that while the economic realities principle may not apply to the intended loss calculation in the Guidelines range, it can still be considered in determining the sentence.

Murphy argues that the Guidelines calculation for loss focuses on the intent and culpability of the offender, not the theoretical maximum gain a defendant could obtain. But the sentencing transcript suggests that the district court contained its determination of intended loss squarely within the analysis of Murphy's intent and culpability. It found that Murphy intended to take the clients who subscribed to NBA's bi-weekly service for his own, which was why the court used the 135,000 subscribers in its calculations instead of the total number of clients in the NBA database.

Murphy also argues that the Government's evidence was insufficient to prove the loss amount because it was unclear how many clients NBA had when he attempted to obtain the list, there was no indication that he sought the whole list, and NBA had only restarted a fraction of the 135,000 accounts at the time of the sentencing.

The district court addressed these concerns. While it is true that NBA was not servicing any clients at the time of the offense and an exact number of potential clients that Murphy could

reach is impossible to determine, the intended loss calculation only needs to be a "reasonable estimate" and does not require a precise number. USSG § 2B1.1 cmt. 3(C); *Warshak*, 631 F.3d at 329. The district court found that using the 135,000 customers is reasonable because that is the number of subscribers to NBA's bi-weekly service before the injunction, and Murphy intended to offer the same service to those customers. It did not need to determine whether Murphy sought to solicit the whole list of clients or his expectations of success to make a "reasonable estimate" of intended loss. The extent of NBA's restarted services may go to the amount of actual loss to NBA, but it is immaterial to the loss intended by Murphy. The district court's factual findings are not clearly erroneous.

### B.    Definition of Intended Loss

If a party had a meaningful opportunity to object to the sentencing procedure but did not do so, "plain-error review applies on appeal to those arguments not preserved in the district court." *United States v. Vonner*, 516 F.3d 382, 385 (6th Cir. 2008). Plain error review requires the party appealing a new argument to show "(1) error (2) that 'was obvious or clear,' (3) that 'affected defendant's substantial rights' and (4) that 'affected the fairness, integrity, or public reputation of the judicial proceedings.'" *Id.* at 386 (quoting *United States v. Gardiner*, 463 F.3d 445, 459 (6th Cir. 2006)). Murphy's argument that the commentary definition of "intended loss" should not apply over the definition of "loss" in 18 U.S.C. § 1030 is reviewed for plain error because he did not raise it below.

Murphy was convicted under 18 U.S.C. §§ 1030(b), (a)(2), and (c)(2)(b), provisions of the Computer Fraud and Abuse Act (CFAA). Murphy's crime does not include an element of loss, but "loss" is defined within the CFAA in the following way:

> As used in this section . . . the term "loss" means any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment,

and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service.

18 U.S.C. § 1030(e)(11). This definition of "loss" is narrower than the definition of "intended loss" in Application Note 3, and the Guidelines range calculation would no doubt be significantly lower under the statutory definition. But the Supreme Court held in *Stinson v. United States*, 508 U.S. 36 (1993), that courts must generally defer to the commentary to the Sentencing Guidelines promulgated by the Sentencing Commission. "[C]ommentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson*, 508 U.S. at 38.

A review of the statute reveals that "loss" as defined in 18 U.S.C. § 1030(e)(11) is not relevant to Murphy's convictions. The word or even the concept of "loss" does not appear in any of the relevant provisions of Murphy's count of conviction—18 USC §§ 1030(b), (a)(2), and (c)(2)(B). "Loss" under the statute is relevant in three places: a separate criminal offense where loss is an element, 18 U.S.C. § 1030(a)(5)(C); as part of the requirements for additional penalties for a separate criminal offense, 18 USC § 1030(c)(4)(A)(i)(I); and as part of a provision that establishes a private right of action, 18 U.S.C. § 1030(g). Even if the concept of loss were relevant to Murphy's convictions, the two definitions do not directly conflict. They serve different purposes—the statutory definition clarifies elements of an offense for purposes of criminal charges, and the Guidelines commentary interprets terms found within the Guidelines for purposes of sentencing.

Murphy also argues that the commentary definition of "loss" is an invalid attempt of the Commission to bypass Congress, citing our precedent on a separate Guidelines commentary

provision defining "controlled substance offense." *United States v. Havis*, 927 F.3d 382 (6th Cir. 2019) (en banc). *Havis* clarifies when Guidelines commentary, which "never passes through the gauntlets of congressional review or notice and comment" and "has no independent legal force," is binding on courts: "[c]ommentary binds courts only 'if the guideline which the commentary interprets will bear the construction.' Thus, we need not accept an interpretation that is 'plainly erroneous or inconsistent with the' corresponding guideline." *Id*. at 386 (quoting *Stinson*, 508 U.S. at 45, 46) (internal citation omitted).

*Havis* is distinguishable from Murphy's case. In *Havis*, we found that commentary *adding* "attempt" crimes to the definition of "controlled substance offense" under the Guidelines is not an interpretation, and thus the commentary deserves no deference. *Id.* Section 2B1.1(b), however, is part of a chart on the amount of loss with corresponding increases in offense levels, but in which "loss" is left undefined. The commentary defining "loss" is consistent with the construction of the Guidelines as an interpretation of, rather than an addition to, §2B1.1(b). It should be afforded deference under *Stinson*.

We have consistently applied the commentary on "intended loss" when calculating the Guidelines range. *See, e.g.*, *United States v. Wendlandt*, 714 F.3d 388, 393 (6th Cir. 2013). And other circuits have also held that deference to the Commission under *Stinson* is applicable for intended loss calculations. *See, e.g.*, *United States v. Nagle*, 803 F.3d 167, 179 (3d Cir. 2015) ("We 'keep in mind that [G]uidelines commentary, interpreting or explaining the application of a guideline, is binding on us when we are applying that guideline because we are obligated to adhere to the Commission's definition.'" (quoting *United States v. Savani*, 733 F.3d 56, 62 (3d Cir. 2013))); *United States v. Dowl*, 619 F.3d 494, 502 (5th Cir. 2010) (noting that loss commentary is authoritative under *Stinson*); *United States v. Crowe*, 735 F.3d 1229, 1237 (10th Cir. 2013)

(affirming that "Application Note 3 to § 2B1.1 fleshes out how the district court is to calculate 'loss.'").

The district court's adherence to the commentary definition rather than the definition of loss in the statute was not plainly erroneous. Our circuit and others have consistently applied the commentary in question as interpretation of the Guidelines. *Stinson* explains when courts should defer to the commentary, and the district court's deference here was consistent with that analysis. The district court did not commit error regarding the intended loss calculation.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's denial of Murphy's objection to his Guidelines range and his sentence.

**THAPAR, Circuit Judge, concurring.** I join the Majority's thoughtful opinion, as it faithfully applies current law. I write separately to comment on one aspect of the current law that I believe is both unnecessary to decide this case and inconsistent with the Constitution.

Under *Stinson v. United States*, 508 U.S. 36 (1993), courts are instructed to defer to the Sentencing Commission when it interprets its own rules. The problem with that? "[J]ust as a pitcher cannot call his own balls and strikes, an agency cannot trespass upon the court's province to 'say what the law is.'" *United States v. Havis*, 907 F.3d 439, 450 (6th Cir. 2018) (Thapar, J., concurring) (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)), *vacated*, 921 F.3d 628, *on reh'g en banc*, 929 F.3d 317 (6th Cir. 2019) (per curiam). Allowing an agency to *interpret* law—an exercise usually reserved for courts—does just that.

But make no mistake—this problem is not merely theoretical. *Stinson*, like all agency deference doctrines, creates real-world issues. That's because agencies have an incentive to make vague rules so they can later "interpret" those rules how they wish without following rulemaking requirements. *Havis*, 907 F.3d at 450 (Thapar, J., concurring). And agency deference should be even more troubling in a criminal case like this one, when personal liberty lies at stake. *Id.*

All the worse because we need not even apply *Stinson* in this case. Murphy's argument that the commentary undermines Congress's work cannot survive plain-error review even *without* deference to the guidelines. First, the supposedly conflicting statutory definition Murphy points to is wholly irrelevant. *See* Majority Op. at 9. Second, the commentary here does not purport to add to (or contradict) the text of the Guidelines, so it poses no problem under this circuit's precedent in *Havis*. Majority Op. at 10 (citing *Havis*, 927 F.3d at 386).

In sum, *Stinson*—and all the constitutional problems that accompany it—have no place here. I respectfully concur.

**JANE B. STRANCH, Circuit Judge, concurring.** The concurrence joining this opinion argues that *Stinson* deference is inappropriate. *See United States v. Havis*, 907 F.3d 439, 450 (6th Cir. 2018) (Thapar, J., concurring), *vacated*, 921 F.3d 628, *on reh'g en banc*, 927 F.3d 382 (6th Cir. 2019) (per curiam). In my view, Congress operates within its constitutional authority in delegating complex matters to agencies; such delegation is appropriately circumscribed by established checks and balances and the realities governing agency operation; and, none of the arguments presented provide a "reason to question the wisdom of our longstanding" system of deference that continues to function appropriately and effectively. 907 F.3d at 447–50 (Stranch, J., concurring).