NOT RECOMMENDED FOR PUBLICATION
File Name: 12a0772n.06

**FILED**

**Jul 18, 2012**

LEONARD GREEN, Clerk

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| *v.* | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| BRYAN TIMOTHY CURTIS, | ) | WESTERN DISTRICT OF KENTUCKY |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | OPINION |

Before: GIBBONS, GRIFFIN, and DONALD, Circuit Judges.

DONALD, Circuit Judge. Defendant Bryan Timothy Curtis was convicted on one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 371, and five counts of structuring financial transactions to evade reporting obligations, in violation of 31 U.S.C. § 5324(a)(3). Curtis was sentenced to sixty-three months of imprisonment, which included two sentencing enhancements: one for obstruction of justice and one for committing counts 2-6 as part of a pattern of unlawful activity involving more than $100,000 in a 12-month period. Curtis now appeals, claiming the district court erred in allowing him to represent himself and in applying both two-level sentencing enhancements. Curtis also believes that the trial transcripts do not accurately reflect the proceedings. For the following reasons, we affirm.

I.

In 1998, Curtis began a romantic relationship with Cynthia Beeckman. Beeckman had embezzled money from her employer and indicated that Curtis had encouraged her embezzlement.[1] She subsequently began transferring large portions of the stolen funds to several bank accounts maintained by Curtis. Curtis denied that he knew the funds were being illegally transferred.

An investigation revealed that between 2000 and 2007, Beeckman transferred a total of $2,434,353.93 to bank accounts controlled by Curtis.[2] The amounts transferred ranged from $136,473.20 to $916,516.78 per year. FBI Special Agent David McClelland testified that when Curtis withdrew cash or wrote checks from the bank accounts to which Beeckman transferred money, he often did so in increments below $10,000. The transactions included depositing cash and cashing checks. Curtis wrote many checks to family members. One of these individuals would cash the checks and remit the cash to Curtis. Curtis spent most of the money gambling at area casinos.

On July 8, 2009, Curtis was indicted and charged with one count of conspiracy to commit wire fraud and five counts of structuring financial transactions to evade reporting requirements. Curtis initially retained counsel to represent him, but, on November 19, 2009, his counsel moved to withdraw due to "irreconcilable differences." In response to the motion to withdraw, Curtis informed the magistrate judge that he wished to represent himself. The court asked Curtis if he was

---

[1]Beeckman admitted to embezzling funds from her employer, Brewer, Inc., from 1999 until 2007, and pled guilty to a violation of 18 U.S.C. § 371.

[2]Bank records are only kept for seven years, so records of transfers from 1999 were not available to investigators.

able to afford counsel on his own, and Curtis replied that he was not. The court then informed Curtis that if he was eligible, the court would appoint counsel at no cost to him. Curtis said he understood. The court asked Curtis if he had ever studied law. Curtis answered "no." When asked about his level of education, Curtis said he had an undergraduate and a master's degree. The court inquired whether he had ever represented himself in any other criminal proceedings. Curtis answered "no." The court recited, in detail, the charges and penalties Curtis was facing to ascertain if he had a clear understanding of the seriousness of the situation. The court informed Curtis that it could not tell or advise him on how to try his case.

Next, the magistrate judge asked Curtis if he was familiar with the Federal Rules of Evidence and explained what those rules are used for in court proceedings. Curtis stated that he was familiar with the Rules, but he admitted that he had never seen a copy of them. The court explained to Curtis that he was at a disadvantage not knowing these Rules. Curtis stated that he still wished to represent himself. The court informed Curtis that it would be under no obligation to relax the application of the Rules. Curtis indicated that he understood. The magistrate judge then asked Curtis about his knowledge of the Federal Rules of Criminal Procedure. Curtis was not familiar with those Rules, and the court explained the scope and function of the Rules. The court reiterated that Curtis was at a disadvantage, and, again, that it would not relax the Rules. The following exchange then took place between Curtis and the magistrate judge:

THE COURT: I must advise you that in my opinion a trained lawyer will defend you far better than you could defend yourself in this case. I think it's unwise of you to try to represent yourself. You're not familiar with the law or at least you say you're familiar with the statute, but have no familiarity with the Federal Rules of Evidence, no familiarity with the Federal Rules of Criminal

Procedure despite the fact that you perhaps have read through the statute that you're charged with, you may not understand case law which interprets those statutes. Have you read upon any case law which interprets the statutes involved in this case?

MR. CURTIS:     No, sir.

THE COURT:     I strongly encourage you not to represent yourself in this case.

MR. CURTIS:     Okay. I appreciate your advice, sir.

THE COURT:     And in light of the penalty that you might suffer upon conviction in this case if you're found guilty, and in light of all the difficulties that I've pointed out and that we've talked about in representing yourself, do you still desire to represent yourself and to give up your right to be represented by an attorney?

MR. CURTIS:     Yes, sir.

THE COURT:     Mr. Curtis, I feel compelled to ask you, are you at this time under the influence of any alcohol or drugs?

MR. CURTIS:     Absolutely not, sir.

THE COURT:     None whatsoever. You don't appear to be. I will say this for the record. You do not have an appearance of a person who is under the influence. My concerns are that when we engaged in the type of dialogue you and I have engaged in here concerning whether or not you have got your wits about you, that you understand the situation that you're in, you understand the disadvantages that I've pointed out, and that you're still willing and want to represent yourself in this matter?

MR. CURTIS:     Yes, sir.

....

THE COURT:     Okay. I do find at this time, Mr. Curtis, that you have knowingly and voluntarily waived your right to counsel in this case, and I will, therefore, permit you to represent yourself in this action. And I will enter an order to that effect in this case.

MR. CURTIS:     Thank you, sir.

The magistrate judge then discussed the possibility of appointing standby counsel and explained what standby counsel's role would be. Curtis declined the offer of standby counsel. The court, once again, asked Curtis if he wished to represent himself, and he replied that he did. The court informed Curtis that the trial judge may appoint standby counsel whether Curtis wanted standby counsel or not.

The conversation regarding representation then closed with this exchange:

THE COURT:      [I]n my professional judgment, you shouldn't be representing yourself in this case. You need to go ahead and accept court-appointed counsel or the federal defender if, in fact, you're eligible.

MR. CURTIS:     With all due respect, sir, no, sir. Thank you.

At the pretrial conference, the district court judge indicated that he had appointed standby counsel for Curtis and explained the role of standby counsel. The judge then asked Curtis if he still wished to proceed *pro se*. Curtis indicated that he was not going to withdraw his request to represent himself and that he was "ready to go." The court asked, "You're sure? ... No turning back?" Curtis replied, "Yes sir."

During trial, Curtis called Mrs. Bette Curtis, his mother, to testify. On approximately the fourth question to his mother, Curtis asked, "In this courthouse, during the course of this trial, were you threatened by Marisa Ford?" Mrs. Curtis replied in the affirmative. Ms. Ford, the prosecutor, promptly objected. Curtis was allowed to continue the examination of his mother, and Ford was permitted to cross-examine Mrs. Curtis. Mrs. Curtis testified that in an upstairs hallway of the courthouse on the first day of trial, Ford threatened to impeach and jail her if her testimony differed in any way from her testimony before the grand jury in 2008.

Curtis was ultimately convicted on all six counts. He then moved for a new trial on the grounds that the district court erred in allowing him to represent himself. The court denied his motion and stated

> The Defendant was warned of the consequences of proceeding pro se. He was made fully aware of the hazards and disadvantages of self-representation. The Magistrate did everything possible to dissuade the Defendant from his insistence on representing himself. The undersigned did likewise but to no avail. Stand-by counsel was appointed but the Defendant chose mainly not to utilize him. The Defendant's decision to represent himself was made knowingly and voluntarily.

Curtis received court appointed counsel for the sentencing hearing. At the sentencing hearing, defense counsel objected to the imposition of the two two-level sentencing enhancements for obstruction of justice for suborning his mother's perjury and for committing counts 2-6 as part of a pattern of unlawful activity involving more than $100,000 in a 12-month period. Defense counsel stated that Curtis denied instructing or suggesting his mother lie on the stand. Counsel also argued that further proof of obstruction, linking the action to the defendant, was necessary to impose the enhancement.

Ford asserted that she was willing to testify as a witness to provide the court with proof that Mrs. Curtis lied on the stand. She asserted that the court could draw an inference from her conversation on the first day of trial with Curtis and his mother's testimony that Curtis knowingly allowed or encouraged his mother to commit perjury. Ford further argued that Mrs. Curtis was put on the stand to try and show that the prosecution "had engaged in some kind of outrageous government conduct to try to get, if not an entire jury, at least one or two jurors to nullify in this case." The court permitted Ford to testify so it could decide the issue.

Ford testified that Mrs. Curtis was subpoenaed to testify before the grand jury on October 8, 2008, and that she questioned Mrs. Curtis at that time about checks that she had cashed for her son. She further testified that on the first day of Curtis's trial, she had a brief discussion with Curtis before voir dire. She described the conversation as follows:

> I approached Mr. Curtis the morning of trial on March 29th, and provided him directly the Jencks Act material and attempted to explain to him what Jencks Act material was. I advised him these were witnesses the United States intended to call at trial, and that he was entitled to copies of their prior sworn testimony.
>
> I came back to my seat here in the courtroom. Mr. Curtis followed me across the courtroom and asked about his mother's -- a transcript of his mother's grand jury testimony. He didn't ask about his father's testimony, but specifically asked about the transcript of his mother's grand jury testimony.
>
> I advised him at that time that it appeared most likely that Mr. Curtis would probably call his mother as a witness in the case rather than the United States. And that being the case, it was not Jencks Act material. He was not entitled to a copy of her grand jury testimony.
>
> And that in the event that he decided to call her as a witness at trial, at that point, if in some way her testimony at trial deviated or differed in any material respect from her prior testimony in the grand jury, that she could be impeached with that information from her prior sworn statement.
>
> Mr. Curtis appeared somewhat angered by my comments and asked me, what makes you think my mother would change her testimony.
>
> And I explained to him I was not suggesting that she was going to change her testimony. I was trying to explain to him how the procedure worked since he was representing himself, but that he needed to be aware of why it wasn't Jencks Act material, and how it could be potentially used through the course of the trial.

Ford then testified that the only time she had contact with Mrs. Curtis was at the federal courthouse in Bowling Green, Kentucky on the day of the grand jury, October 8, 2008. Ford indicated that she saw Mrs. Curtis on the first day of the trial but did not have any conversation with her.

On cross examination, defense counsel suggested that maybe Curtis and his mother were confused regarding impeachment versus perjury and that Mrs. Curtis may have construed Ford's words to her son on the first day of trial as a threat. Ford testified that Mrs. Curtis's testimony at trial "was unequivocal and crystal clear. There wasn't any confusion about what she was testifying to. And what she testified to, never happened." Ford also indicated that on direct examination Curtis never asked his mother about any document relevant to the case. The district court found that Mrs. Curtis intentionally lied, that Curtis knew she was lying, and that the sole purpose in putting his mother on the stand was to manipulate the jury.

The court then addressed the issue of the "pattern" enhancement. Defense counsel argued that the sentencing enhancements constituted double counting since there was already a 14-point enhancement of Curtis's base offense level due to the value of the loss. However, counsel then stated that because the jury found Curtis guilty on count 1, an unlawful theft did occur and it "clearly went over a course of a year, and it clearly exceeded $100,000 in a year. So, candidly, they probably apply." Ford stated that if the funds did not come from an illegal source, the enhancement did not apply, and if they did come from an illegal source, the enhancement did apply. The court found that there was no double counting, that the enhancement did apply, and overruled any objections. Curtis was then sentenced to sixty-three months. This appeal followed.

II.

A. *Pro Se Representation*

Curtis asserts that the district court erred in permitting him to proceed *pro se*. This court has reviewed such claims of error under both a plain error standard and a *de novo* standard. *See United States v. McBride*, 362 F.3d 360, 365-66 (6th Cir. 2004); *United States v. Williams*, 641 F.3d 758, 766 (6th Cir. 2011) (finding that waiver of the right to counsel was proper under either standard).

While the Sixth Amendment guarantees a criminal defendant the right to counsel, a criminal defendant has the right to represent himself and counsel may not be forced upon him. *Faretta v. California*, 422 U.S. 806, 820 (1975). "The language and spirit of the Sixth Amendment contemplate that counsel ... shall be an aid to a willing defendant - not an organ of the State interposed between an unwilling defendant and his right to defend himself personally. To thrust counsel upon the accused, against his considered wish, ... violates the logic of the Amendment." *Id*. However, in order to circumvent the constitutionally guaranteed right to counsel and proceed *pro se*, the accused must knowingly, voluntarily, and intelligently waive this right. *Id.* at 835. When a criminal defendant elects to represent himself, the district court must then engage in a colloquy with defendant in which it asks "the defendant a series of questions drawn from, or substantially similar to, the model inquiry set forth in the *Bench Book for United States District Judges*." *McBride*, 362 F.3d at 366 (citing *United States v. McDowell*, 814 F.2d 245, 250 (6th Cir. 1987)). Upon completion of this inquiry, the court must then make an express finding that the defendant knowingly and voluntarily waived his right to counsel. *Id*.

Curtis claims that, based on the totality of the circumstances, the district court erred in permitting self-representation and, in so doing, committed clear and palpable error. Curtis argues that *Iowa v. Tovar,* 541 U.S. 77 (2004), requires a broader look at case-specific factors and more stringent warnings before permitting self-representation. The district court's questions and warnings were legally insufficient in light of his level of education and sophistication, and the complexity of the charges against him are factors in determining whether he should have been permitted to represent himself, Curtis argues. This claim of error lacks merit.

Curtis's assertions have no merit in the face of the colloquy between the court and Curtis. In accordance with *McBride,* the district court substantially covered the model questions set forth in the *Bench Book for United States District Judges.* In addition to the many questions the district court posed to Curtis, it also repeatedly encouraged him to seek the assistance of counsel. At each instance, Curtis insisted on self-representation. Even after making a specific finding that Curtis had knowingly and voluntarily waived his right to counsel, the magistrate judge again asked Curtis if he wanted to represent himself. Once more, Curtis rejected the idea of counsel. Moreover, the district court attempted to protect Curtis further by appointing standby counsel to assist him. However, Curtis, for the most part, declined to avail himself of standby counsel.

While the *Tovar* Court did indicate that it looks at case specific factors such as education or sophistication, the complexity of the charges, and the stage of the proceeding, it nonetheless held that the Sixth Amendment does not compel specific admonitions before allowing a defendant to represent himself. 541 U.S. at 88, 91-92. The Supreme Court reiterated that "'[t]he law ordinarily considers a waiver knowing, intelligent, and sufficiently aware if the defendant fully understands the nature

of the right and how it would likely apply *in general* in the circumstances - even though the defendant may not know the *specific detailed* consequences of invoking it.'" *Id*. at 92 (citing *United States v. Ruiz*, 536 U.S. 622, 629 (2002)) (emphasis in original). The Court further stated that "[i]f [the defendant] ... lacked a full and complete appreciation of all the consequences flowing from his waiver, it does not defeat the State's showing that the information it provided to him satisfied the constitutional minimum." *Id.* at 92 (citing *Patterson v. Illinois*, 487 U.S. 285, 294 (1988)).

The transcript in this case clearly establishes that the district court properly questioned and warned Curtis as to the risks of proceeding *pro se*, and after receiving admonitions regarding self-representation, Curtis knowingly and voluntarily waived his right to counsel. It bears repeating that despite the charges, counsel may not be forced upon Curtis once he knowingly and voluntarily waived his right to counsel. Given the foregoing, the district court did not err in permitting Curtis to represent himself.

B. *Obstruction of Justice Enhancement*

When reviewing a sentencing enhancement for obstruction of justice, we "'[f]irst[] review factual determinations made by the district court for clear error. Second, a determination that certain conduct constitutes obstruction of justice, which is a mixed question of law and fact, is reviewed de novo. Third ... the actual imposition of the enhancements is reviewed de novo.'" *United States v. Boring*, 557 F.3d 707, 712 (6th Cir. 2009) (quoting *United States v. Baggett*, 342 F.3d 536, 540-41 (6th Cir. 2003)).[3]

_____

[3]Contrary to the government's assertions in its brief, there were discussions regarding a finding on the *Dunnigan* factors at the sentencing hearing. Thus, the three-pronged standard of

The Sentencing Guidelines state

If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

USSG § 3C1.1. "Committing, suborning, or attempting to suborn perjury" is conduct to which the enhancement applies. USSG § 3C1.1 cmt. n.4(B). *United States v. Dunnigan* held that perjury consists of "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." 507 U.S. 87, 94 (1993). A material matter is one that "if believed, would tend to influence or affect the issue under determination." USSG § 3C1.1 cmt. n.6.

Curtis argues that the district court should not have imposed a two-level enhancement to his base offense level for obstruction of justice because its findings were not sufficient to make a determination of willful impediment or that an obstructive act took place at trial. Curtis further argues that the statement constituting obstruction was not material, nor was it made with the willful intent to deceive.

Because Curtis objected to the sentencing enhancement, the district court must "review the evidence and make independent findings necessary to establish a willful impediment to or the obstruction of justice resulting from [the] ... perjury. When doing so, the court should address each element of ... perjury in a separate and clear finding. Alternatively, a court may conclude that

review applies.

enhancement is appropriate on the basis of a finding ... that encompasses all the factual predicates of perjury." *United States v. Lawrence*, 308 F.3d 623, 632 (6th Cir. 2002).

Mrs. Curtis testified during the trial that Ford personally threatened to "throw her in jail" if her testimony at trial materially deviated from her testimony to the grand jury. At the sentencing hearing, Ford testified that Mrs. Curtis's accusation was false and that she (Ford) never threatened Mrs. Curtis with a perjury charge or jail time. "When faced with conflicting testimony, '[t]he trier of fact, not the appellate court, holds 'the responsibility ... fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts[.]'" *Boring*, 557 F.3d at 711 (quoting *Tibbs v. Florida*, 457 U.S. 31, 45 n. 21 (1982)).

At the sentencing hearing, the district court credited the prosecutor's testimony and made specific findings that Mrs. Curtis lied on the stand when she claimed that Ford threatened her, that Curtis knew she was lying, and that the sole purpose of the lie was to manipulate the jury's feelings on the issue. These findings clearly establish the elements of perjury set forth in *Dunnigan*. The statement by Mrs. Curtis was also material, since, if believed, the jury might not credit the prosecution's case against Curtis and might return a verdict of not guilty.

The district court heard testimony and made a determination that Mrs. Curtis's testimony was not credible and that Ford's testimony was credible. Because the determination was supported by the facts, the district court did not commit clear error. Further, Curtis's act of suborning his mother's perjury constitutes obstruction of justice. While Curtis asserts that only a finding that he himself committed perjury will suffice for the sentencing enhancement, as noted above, *suborning* perjury is an act of obstruction and the district court found that Curtis suborned perjury. As such, the base

offense level enhancement for obstruction of justice is appropriate, and the district court did not err

in applying it.

C. *The "Pattern" Enhancement*

Under USSG § 2S1.3(b)(2)(A), a two-point sentencing enhancement is applicable if the

defendant knew or believed the funds were proceeds of unlawful activity, and, under USSG

§ 2S1.3(b)(2)(B), if the defendant committed the offense as part of a pattern of unlawful activity

involving more than $100,000 in a 12-month period.

The jury found that Curtis knew that the money Beeckman gave him was obtained through

unlawful activity, and in a special verdict form, the jury also found, beyond a reasonable doubt, that

Curtis committed the wire fraud as part of a pattern of unlawful activity involving over $100,000

over a 12-month period. Moreover, during the sentencing hearing defense counsel stated that "[the

theft] clearly went over a course of a year, and it clearly exceeded $100,000 in a year. So, candidly,

[the enhancements] probably apply." Based on the jury's findings and defense counsel's statement,

the sentencing enhancement is supported by the facts, and the district court did not err in applying

the enhancements to Curtis's sentence.

D. *The Trial Transcript*

Lastly, Curtis suggests that the trial transcripts do not accurately reflect what occurred in the

district court, and he supplies an affidavit from his sister to support this argument. Federal Rule of

Appellate Procedure 10(e) does not permit this court to alter the record. Under Rule 10(e)(1), "if any

difference arises about whether the record truly discloses what occurred in the district court, the

difference must be submitted to and settled *by that court* and the record conformed accordingly."

(Emphasis added).  Thus, we lack the authority to modify the record.

III.

For the foregoing reasons, we affirm.