RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0291p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

    *v.*

No. 13-5790

DAVID MINER,

        *Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 3:11-cr-00025-1—Thomas W. Phillips, District Judge.

Argued: October 3, 2014

Decided and Filed: December 12, 2014

Before: SILER, CLAY, and GRIFFIN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Robert L. Vogel, THE VOGEL LAW FIRM, Knoxville, Tennessee, for Appellant. Frank M. Dale, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee. **ON BRIEF:** Robert L. Vogel, THE VOGEL LAW FIRM, Knoxville, Tennessee, for Appellant. Frank M. Dale, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee.

_____

## OPINION

_____

GRIFFIN, Circuit Judge. David Miner was prosecuted and convicted under 26 U.S.C. § 7212(a) for corruptly endeavoring to obstruct the "due administration" of federal income tax laws. He now appeals, claiming (1) that the district court reversibly erred in failing to instruct

1

the jury that § 7212(a) requires proof that he was aware of a pending IRS proceeding; (2) that his conduct was constitutionally and statutorily protected; and (3) that certain witness testimony was improperly introduced at trial because the witness opined about his state of mind. Concluding that any error was harmless, we affirm.

I.

Uninspired by Justice Holmes's well-known sentiment that "[t]axes are what we pay for civilized society," *Compania Gen. de Tabacos de Filipinas v. Collector of Internal Revenue*, 275 U.S. 87, 100 (1927) (Holmes, J., dissenting), Miner marketed two schemes that promised to defeat their proverbial inevitability.[1] Miner's first scheme operated under the name of IRx Solutions and offered to assist clients in requesting alterations to their Individual Master Files ("IMFs"), which are internal IRS records pertaining to each taxpayer. Miner told prospective clients that the IRS was engaged in widespread fraud by improperly coding individuals as businesses on their IMFs so that tax could be assessed against them. According to Miner, in fact, "everybody's [IMF] is wrong" and needed alteration. For an annual $1,800 fee, IRx Solutions promised to help individuals obtain their IMFs from the IRS, to "decode" them in order to expose "erroneous information," to "gather the evidence necessary to effectively challenge the IRS with substantiated allegations of fraud," and to "force the IRS to make the changes to your IMF necessary to get it out of your life." Further, IRx Solutions would "write letters to the IRS for you" in order to achieve its goal of altering the client's IMF.

The second scheme was offered by a second Miner company, the Blue Ridge Group. Under this program, Miner helped clients create common-law business trusts, into which he claimed that they could place any or all of their assets in order to avoid paying income tax.

Numerous clients purchased one or both of Miner's programs. In August 2006, the IRS began an undercover criminal investigation into Miner's activities. Ultimately, Miner was charged in a superseding indictment with one count of corrupt endeavor to obstruct or impede

---

[1]*See* Letter from Benjamin Franklin to Jean Baptiste Le Roy (Nov. 13, 1789), 10 *The Writings of Benjamin Franklin* 69 (A. Smyth ed. 1907) ("Our new Constitution is now established, and has an appearance that promises permanency; but in this world nothing can be said to be certain, except death and taxes.").

the due administration of the internal revenue laws, in violation of 26 U.S.C. § 7212(a), and two counts of willfully failing to file tax returns in 2004 and 2005, in violation of 26 U.S.C. § 7203.

At trial, one of Miner's employees testified about the general operation of the companies' schemes. In the IMF resolution program, for example, clients would be instructed to file Freedom of Information Act ("FOIA") and Privacy Act requests in order to obtain their IMFs. Miner would give the clients form letters to send to the IRS when their requests were not met favorably. The letters contained notices that if the IRS did not comply with the client's demands, the client would pursue legal remedies against the IRS and against the individual IRS agents who were working the client's file.

Several of Miner's clients also testified at trial about their interactions with him. Jeff Myslewski, for example, specifically testified that he purchased both the IMF resolution program and the trust creation program only after informing Miner that the IRS was actively pursuing him to pay assessed funds. Myslewski testified that one of the first things that he told Miner was that he was starting an offer in compromise with the IRS due to pending tax issues. Miner then told him about the IMF resolution program and about creating a business trust. Thus, only after Myslewski told Miner "what [his] specific situation with the IRS was"—including that federal tax liens had been filed against him several years earlier—did Miner assist Myslewski in creating a trust and in starting the process of obtaining his IMF.

Myslewski forwarded to Miner copies of IRS notices of deficiency and of taxes past due that Myslewski had previously received from the IRS. Soon afterward, Miner drafted a letter that he advised Myslewski to "mail to the IRS in response to its Notice of Deficiency." Miner told Myslewski that, although the IRS "[m]ost likely . . . will not answer the letter . . . also most likely, this letter will stall the IRS long enough for us to clean up your IMF." The letter itself (which Myslewski sent to the IRS) berated the IRS for keeping "fraudulent details" in the IMF file and informed the IRS that "I expect to bring charges against more than one IRS employee for the fraud clearly evident in my IMF and other files." When the IRS responded to the letter by informing Myslewski that he needed to file an amended tax return in order to amend his IMF, Miner prepared another letter for Myslewski to send to the IRS, threatening legal action and castigating the IRS for knowingly violating the law by refusing to comply with his request to

amend the IMF.  Myslewski similarly testified that the trust that he purchased from Miner was intended to be a tax-exempt entity, meaning that he purportedly could place his personal income in the trust and pay no taxes on it.

Other clients similarly testified that Miner helped them navigate existing IRS difficulties and advised them to create trusts for the purpose of avoiding the payment of income tax.  For instance, Hans Himmel testified that he purchased Miner's programs because Miner promised that they would make him "invisible" to the IRS so that he would no longer need to pay income tax.  So did Roger McGee.  Steve Puleo similarly testified that Miner created a trust for him so that his company could pay him as a contractor without withholding taxes—a setup that Puleo agreed was "an arrangement for tax evasion."  Puleo further testified that when the IRS directed his company to withhold the taxes notwithstanding the creation of the trust, Miner prepared and sent to the IRS letters complaining of its "illegal directive" to pay the taxes in question and threatening to sue the IRS unless it ceased its collection activity.

David Ebert likewise testified that he asked Miner to create a trust for him because he wanted to avoid paying income taxes.  According to Ebert, Miner told him not to open an interest-bearing account for his trust in order to avoid the earned interest being reported by the bank to the IRS.  Ebert also testified that Miner advised him that most clients wanted to avoid associating their social security numbers with the trusts' bank accounts because the IRS often searched for taxpayer assets using the taxpayer's social security number.  "[W]ithdrawing cash from your personal account and depositing the cash into your trust account is perhaps the ideal way to handle things," suggested Miner, who noted that "a direct link between your paycheck and the trust" could be used by the IRS to cause Ebert "some headaches."  Miner noted that his own practice was to establish a personal checking account "so the IRS can find something if it tries."  Then, "when the balance gets large enough to attract attention," Miner would "withdraw cash and deposit in one of my trust accounts," thereby avoiding the "unwise" practice of establishing a direct link between his personal assets and his trust account.

Miner also gave Ebert instructions about what to do if the IRS contacted him, including a list of questions that would help Ebert "act as if you are cooperating with the IRS" but were in fact intended to prod the IRS into terminating the encounter.  Finally, Ebert identified an email

that he received from Miner after his trust was created, informing Ebert that he could "place [his] home, investments and cash assets in a second trust and they would be out of reach of the IRS for any other liability issues."

According to the government's evidence, most of the letters prepared by Miner for his clients were written in response to pending IRS action. Joan Homick, for example, forwarded Miner a February 2010 letter that she received from the IRS that identified a $75,000 tax deficiency and observed that she had presented "a lot of frivolous arguments" that were the product of "bad advi[c]e." Miner drafted a response for her, entitled "Notice of Pending Legal Action and Demand for Records Correction," falsely informing the IRS revenue officer that "I am in the process of taking legal action against certain specific IRS employees" and warning that "[t]he legal remedy I am seeking will include you if you continue forward with your unlawful actions." Greg Lewis, another of Miner's clients, testified that Miner prepared an almost identical letter for him in response to the IRS's failure to alter his IMF as requested. Miner also wrote letters to a private corporation and to a bank on behalf of one of his clients, urging them not to comply with supposedly fraudulent IRS levies seeking the assets of his client and threatening legal action if they did.

The government also presented testimony from an IRS agent that Privacy Act requests like those submitted as part of Miner's IMF resolution program are frivolous and a waste of IRS resources, especially because the Privacy Act cannot be used to amend tax records. An expert witness also detailed the unusual characteristics of the trusts created by Miner for his clients, noting that they purportedly allowed the grantors simultaneously to disclaim ownership of assets and maintain control of them. In the expert's opinion, the trusts were "sham" entities that were designed to avoid "pay[ing] taxes on . . . income." The witness also described the letters sent by Miner to the IRS as "frivolous . . . protest" letters to which the IRS would not respond.

Finally, IRS special agent Susanne Lee testified, summarizing her investigation into Miner's activity. Miner objected to much of her testimony, noting that Agent Lee had not been tendered as an expert witness and that significant portions of her testimony were argument, intruding into the province of the jury. The district court overruled almost all of Miner's objections.

After the government rested, Miner moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29, arguing that all of his conduct was protected by the First Amendment, meaning that he was not acting "corruptly," as required for a conviction under § 7212(a). The district court denied the motion. Miner then testified in his own defense, claiming that he did not believe that individual taxpayers needed to pay taxes on income, which is why he had stopped filing income tax returns after 1990. Miner also testified that he believed that the business trusts he created and the IMF resolution program he operated were perfectly legal.

At the conclusion of the evidence, Miner requested that the jury be instructed that he could be convicted under § 7212(a) only if he was aware of a pending IRS proceeding when he engaged in the conduct at issue. Miner also renewed his Rule 29 motion on the basis that there was no evidence of any such awareness. The district court denied his motions and declined to instruct the jury as Miner had requested.

The jury found Miner guilty on all counts. Miner was subsequently sentenced to eighteen months of imprisonment on the § 7212(a) conviction and to concurrent twelve-month terms on the two failure-to-file convictions. He now appeals.

II.

On appeal, Miner argues only that his conviction on count one (corrupt endeavor to impede the administration of the internal revenue laws) should be reversed; he does not challenge the other two counts of conviction. According to Miner, his conviction on count one should be reversed because (1) the district court failed to instruct the jury that Miner could be convicted only if he was aware of a pending IRS proceeding that could be impeded; (2) his conduct was constitutionally protected, meaning that the trial evidence was insufficient to support his conviction; and (3) portions of Agent Lee's trial testimony should not have been admitted. Although we agree with Miner that the district court erroneously instructed the jury and that certain aspects of Agent Lee's testimony were improper, we agree with the government that the errors were harmless.

A.

The mainstay of Miner's assertions on appeal is his argument that § 7212(a) requires proof that he knew of a pending IRS proceeding when he engaged in the conduct that impeded the IRS's ability to administer the revenue code. We review de novo Miner's claim that the district court improperly failed to instruct the jury on one of the elements of the crime with which he was charged. *See United States v. Reichert*, 747 F.3d 445, 451 (6th Cir. 2014). Nevertheless, even where the district court erroneously fails to instruct the jury on an element of a criminal offense, the error is not reversible if it is harmless—that is, if "it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Neder v. United States*, 527 U.S. 1, 15 (1999) (internal quotation marks omitted).

1.

We agree with Miner that the district court should have instructed the jury that it could convict him only if it found that he was aware of a pending IRS proceeding.

26 U.S.C. § 7212(a), under which Miner was convicted, criminalizes anyone who

corruptly or by force or threats of force (including any threatening letter or communication) endeavors to intimidate or impede any officer or employee of the United States acting in an official capacity under this title, or in any other way corruptly or by force or threats of force (including any threatening letter or communication) obstructs or impedes, or endeavors to obstruct or impede, the due administration of this title.

*Id.* As we have explained, this language is reducible to two distinct parts. The first clause of § 7212(a) "is aimed at specific threats against an officer or employee acting in an official capacity." *United States v. Kassouf*, 144 F.3d 952, 955 (6th Cir. 1998). The second clause, known as the "omnibus clause" or the "catch-all clause," applies to all "other activities which may obstruct or impede the due administration of the title." *Id.* The parties agree that Miner's prosecution proceeded under the omnibus clause on the theory that he "in any other way corruptly . . . endeavor[ed] to obstruct or impede, the due administration of [the internal revenue laws]." *Id.* This court, like many others, has held that "[t]o act corruptly means to act with the intent to secure an unlawful benefit either for oneself or another." *United States v. McBride*,

362 F.3d 360, 372 (6th Cir. 2004) (citation omitted).  *See also United States v. Floyd*, 740 F.3d 22, 31 (1st Cir. 2014).

Miner's argument turns not upon the plain language of the statute but upon two of our previous cases, which reach differing conclusions regarding whether a conviction under § 7212(a)'s omnibus clause requires proof of a defendant's awareness of a pending IRS proceeding.

Miner relies heavily upon our decision in *Kassouf*.  There, a panel of this court narrowly construed the omnibus clause, focusing on § 7212(a)'s requirement that the defendant's conduct be aimed at impeding the "due administration" of the internal revenue laws.  144 F.3d at 957.  The *Kassouf* panel was concerned that a broad interpretation of the omnibus clause would "open[] the statute to legitimate charges of overbreadth and vagueness" because it could apply to any conduct that merely had the potential to make it more difficult for the IRS to assess taxes or locate taxpayer assets at some point in the future.  *Id*. at 958.  As a result, *Kassouf* strictly construed the omnibus clause as requiring proof that a defendant was aware of "some pending IRS action"—such as a subpoena, audit, or criminal tax investigation—when he engaged in the potentially impeding conduct.  144 F.3d at 957 & n.2.

Our court in *Kassouf*, recognizing that this construction of the statutory language was not the only plausible interpretation of the omnibus clause, relied heavily on the analysis driving the Supreme Court's decision in *United States v. Aguilar*, 515 U.S. 593 (1995).  *Aguilar* involved the proper construction of the federal obstruction-of-justice statute, which contained an omnibus clause that criminalized anyone who "corruptly . . . endeavors to influence, obstruct, or impede, the due administration of justice."  *Id*. at 598 (quoting 18 U.S.C. § 1503).  *Aguilar*, noting that the broadly worded clause needed to have some limits in order to give "fair warning" of what it criminalized, observed that "a person lacking knowledge of a pending proceeding necessarily lack[s] the evil intent to obstruct" required for conviction under the statute.  *Id*. at 599.  On this point, the *Aguilar* majority rejected Justice Scalia's dissenting argument that using awareness of a pending proceeding as a baseline proxy for intent unnecessarily limited the scope of the statute.  *See id*. at 613 (Scalia, J., dissenting) (arguing that "an act committed with intent to obstruct" is all that is required for conviction under the statute's omnibus clause).

Observing that § 7212(a)'s omnibus clause contains language virtually identical to that used in § 1503, *Kassouf* imported the relevant portion of *Aguilar*'s holding into the § 7212(a) context. *See Kassouf*, 144 F.3d at 957. Echoing the concerns noted by the *Aguilar* majority, *Kassouf* stressed its reluctance to adopt a construction of the statute that would impose criminal liability for a defendant who "may have had no idea that conduct such as the failing to maintain records (before his tax returns were ever filed) might obstruct IRS action because he had no specific knowledge that the IRS would ever investigate his activities." *Id.* at 958. Like the *Aguilar* majority, the *Kassouf* majority rejected a dissenting argument that the statute was sufficiently limited in scope by its *mens rea* requirement. *Id.* at 960 (Daughtrey, J., dissenting).

In response to Miner's reliance upon *Kassouf*, the government argues that *Kassouf*'s broad impact was narrowed by a case decided by a different panel of our court a year later: *United States v. Bowman*, 173 F.3d 595 (6th Cir. 1999). In *Bowman*, the defendant was prosecuted under § 7212(a)'s omnibus clause after he attempted to prompt an IRS investigation into several of his creditors by filing forms with the IRS that falsely indicated that his creditors had received certain taxable income. *Id.* at 599. It was undisputed that the defendant had acted without any awareness of a preexisting, pending IRS proceeding. *Id.* Despite the defendant's argument that *Kassouf* required reversal, the panel in *Bowman* opined that "*Kassouf* must be limited to its precise holding and facts," refusing to construe it as "encompass[ing] the kind of activity for which Bowman was indicted." *Id.* at 600. According to *Bowman*, *Kassouf* does not stand for the proposition that § 7212(a) may never apply to defendants who anticipatorily try to impede the administration of the internal revenue laws before an IRS proceeding has yet been initiated. In fact, opined *Bowman*, "[a]ll of the reasoning in *Kassouf* supports the conclusion that an individual's deliberate filing of false forms with the IRS specifically for the purpose of causing the IRS to initiate action against a taxpayer is encompassed within § 7212(a)'s proscribed conduct." *Id.* at 600. This is because "[t]he filing of false tax forms is not legal when undertaken; it is not speculative; it is specifically designed to cause a particular action on the part of the IRS." *Id.* Thus, despite *Kassouf*'s insistence that § 7212(a) "requires some pending IRS action of which the defendant was aware," 144 F.3d at 957, *Bowman* held that it, in fact, does not—at least when the defendant affirmatively attempts to initiate a frivolous IRS investigation. 173 F.3d at 600.

The government contends that *Bowman*, not *Kassouf*, controls Miner's case. It is mistaken.

The government's error lies in its characterization of *Kassouf* as an exception to *Bowman*, rather than the other way around. To the extent that *Kassouf* and *Bowman* conflict, of course, the first-in-time (*Kassouf*) controls. *See Ward v. Holder*, 733 F.3d 601, 608 (6th Cir. 2013). And *Kassouf* and *Bowman* are less reconcilable than the government asserts. After all, *Bowman*, in rejecting *Kassouf*'s application to a defendant who was attempting to instigate a frivolous IRS proceeding rather than to impede a preexisting one, did so primarily because it believed that the indicia of intent to impede were patently obvious, even though there was no IRS proceeding pending at the time of the defendant's conduct. *See Bowman*, 173 F.3d at 600 (stressing the defendant's "deliberate filing of false forms with the IRS specifically for the purpose of causing the IRS to initiate action against a taxpayer"). Thus, *Bowman* rejected *Kassouf* as erecting an inflexible baseline proxy test for intent—awareness of a pending proceeding—that was under-inclusive as applied to the defendant in *Bowman*.

But that is exactly the same criticism that the dissents in *Kassouf* and *Aguilar* had made earlier, to no avail. *See Aguilar*, 515 U.S. at 613 (Scalia, J., dissenting); *Kassouf*, 144 F.3d at 960 (Daughtrey, J., dissenting). *Bowman*, therefore, is largely predicated upon a rationale that had already lost in this court a year before it was decided.

Thus, although *Bowman* purported to limit *Kassouf* to its facts, it would be more accurate to conclude that the opposite is true. *Kassouf* applies, at minimum, to a defendant who fails to keep "records necessary to determine the tax consequences" of personal transactions, "ma[kes] it more difficult to discover and trace his activities by transferring funds between bank accounts before making expenditures," and "affirmatively misle[ads] the IRS" by filing tax forms that fail to disclose relevant financial transactions and assets. 144 F.3d at 953. *Kassouf*, in other words, applies to defendants whose conduct in failing to disclose or in peculiarly structuring their income and financial transactions generally makes it more difficult for the IRS to identify and collect taxable funds. *Id.* *Bowman*, by contrast, is reducible to a rule that a defendant who intentionally attempts to instigate a frivolous IRS proceeding cannot claim to have lacked the

necessary intent to impede the IRS's administration of its statutory duties with respect to that proceeding.  173 F.3d at 600.  As is evident, *Bowman* is much the narrower of the two decisions.

We recognize that several of our sister circuits have concluded that *Bowman* functionally eviscerated *Kassouf*.  *See, e.g.*, *Floyd*, 740 F.3d at 32 n.4; *United States v. Wood*, 384 F. App'x 698, 704 (10th Cir. 2010); *United States v. Willner*, 2007 WL 2963711, at *4 (S.D.N.Y. Oct. 11, 2007).  But where the rationales of *Kassouf* and *Bowman* conflict, we are bound to follow the former, not the latter.  *See Ward*, 733 F.3d at 608.  In summary, post-*Kassouf* and post-*Bowman*, a defendant may not be convicted under the omnibus clause unless he is "acting in response to some pending IRS action of which [he is] aware."  *McBride*, 362 F.3d at 372 (internal quotation marks omitted).  The extension of *Bowman* that is urged by the government in this case does not represent a path that was unconsidered by *Kassouf*; it represents the path that was not taken.

2.

Having clarified the applicable law, it is not difficult for us to determine which rule applies to Miner.  Even Miner's attempts to have the IRS amend his clients' IMFs are more akin to filing false tax forms to hide one's own income and assets (as in *Kassouf*) than to filing false tax forms in order to sic the IRS on one's creditors (as in *Bowman*).  Because Miner's conduct was not specifically intended to provoke frivolous IRS investigations into third parties but instead had the effect only of making it relatively more difficult for the IRS to assess and collect income taxes from certain individual taxpayers, the government was required to prove that he was aware of "some pending IRS action" involving those taxpayers when he engaged in his impeding conduct.  *See Kassouf*, 144 F.3d at 957; *id.* at 955 (accepting defendant's argument that "it cannot be sufficient to impose criminal liability upon mere allegations that the IRS's job was made harder" by the defendant's conduct).  Miner is therefore correct that the district court should have given a jury instruction consistent with *Kassouf* in this case, where Miner's conduct simply had the potential to make it more difficult for the IRS to identify taxable assets and recover funds from his clients.

However, under the circumstances of the present case, Miner is not entitled to a reversal of his conviction.  A district court's error in failing to instruct the jury on one of the elements of the offense is harmless error only if "it appears beyond a reasonable doubt that the error

complained of did not contribute to the verdict obtained." *Neder*, 527 U.S. at 15 (internal quotation marks omitted). Given the ample evidence that Miner was aware of one or more pending IRS proceedings when he corruptly attempted to obstruct the IRS's administration of the tax laws, the district court's failure to instruct the jury on this element of the offense was harmless beyond a reasonable doubt.

The requirement is that the government prove the defendant's awareness of "some pending IRS action." *Kassouf*, 144 F.3d at 957. Such action "may include, but is not limited to, subpoenas, audits or criminal tax investigations." *Id.* at 957 n.2. This means that the government must prove that the defendant is aware that the IRS has taken some step to investigate a particular taxpayer beyond routine administrative procedures such as those required to accept and process tax filings in the ordinary course. *See id.* at 958. In other words, the impeding conduct must be linked to a specific IRS inquiry into a particular taxpayer: Once the defendant knows that the IRS's interest in a given taxpayer (including himself) has been piqued in a manner that is out of the ordinary, any attempt to corruptly impede the IRS's inquiries into the taxpayer after that point is potentially criminal. *See id.* at 957–58 (emphasizing that, without a link to a pending proceeding, a defendant could only speculate whether his conduct ever would impede the IRS).

At Miner's trial, a welter of evidence was introduced demonstrating his knowledge of pending IRS proceedings at the time that he engaged in the obstructive conduct for which he was convicted. Indeed, the central issue that was contested at trial was whether Miner acted corruptly; there was no real dispute that he acted at least with awareness that the IRS was actively investigating his clients when he engaged in most of his conduct.

Miner's interactions with Myslewski are an instructive example. The IRS, of course, does not issue notices of deficiency or obtain tax liens against individuals as a routine matter; it takes these steps only after determining that a particular taxpayer must be pursued for additional funds. *See, e.g.*, 26 C.F.R. § 301.6212–1 (notices of deficiency); 26 C.F.R. § 301.6321–1 (tax liens). And there is no dispute that all of Miner's interactions with Myslewski—both in operating the IMF resolution program and in creating the trust—occurred after Miner was aware that Myslewski had received at least one notice of deficiency from the IRS, was subject to

federal tax liens, and had begun working on an offer in compromise. In fact, Miner provided Myslewski with a letter to "mail to the IRS in response to its Notice of Deficiency" in order to "stall the IRS long enough for us to clean up your IMF." Thus, even Miner believed that the letter—which he admitted would probably not garner a response from the IRS—was a frivolous attempt to stall pending IRS action, rather than a legitimate request for information to which Myslewski was entitled.

In light of this and similar evidence, it is beyond a reasonable doubt that the verdict against Miner was not affected by the district court's failure to instruct the jury that § 7212(a)'s omnibus clause required proof of Miner's awareness of a pending IRS proceeding. Miner purported to serve numerous of his clients by drafting frivolous letters to the IRS in response to notices of tax deficiencies and frivolously demanding that third parties not comply with IRS levies of client assets. Whether Miner was aware of pending IRS proceedings was not materially in dispute at trial; it was essentially uncontested that much of his conduct was taken directly in response to ongoing IRS investigations into his clients. Because, beyond a reasonable doubt, even a properly instructed jury would have concluded that Miner was aware of pending IRS proceedings when he engaged in much of his culpable conduct, we hold that the district court's failure to properly instruct the jury on this element of the offense was harmless.

B.

Miner also contends that the statute is unconstitutional as applied to his circumstances. In Miner's view, § 7212(a)'s omnibus clause reaches such a large swath of conduct protected by the First Amendment that it is both unconstitutionally vague and unconstitutionally overbroad. Miner also contends that his conviction cannot be predicated upon his threats to sue governmental officials or upon his FOIA and Privacy Act requests because he is entitled by statute and under the Constitution to seek information from the government and to seek redress for alleged governmental misconduct in a court of law. In this respect, Miner's contention is that insufficient evidence supported his conviction.

He is mistaken in both respects. First, to the extent that Miner challenges the omnibus clause on overbreadth and vagueness grounds, *Kassouf*'s pending-proceeding requirement substantially narrows the statute's sweep. *See Kassouf*, 144 F.3d at 958. So does the statute's

*mens rea* requirement, which restricts the omnibus clause's reach only to conduct that is committed "corruptly." *See, e.g.*, *Floyd*, 740 F.3d at 31; *United States v. Kelly*, 147 F.3d 172, 176–77 (2d Cir. 1998); *United States v. Reeves*, 752 F.2d 995, 999–1001 (5th Cir. 1985); *United States v. Brennick*, 908 F. Supp. 1004, 1012 (D. Mass. 1995). *See also United States v. Kay*, 513 F.3d 461, 463 n.1 (5th Cir. 2008) (noting that "corruptly" is almost a willfulness requirement); *Kelly*, 147 F.3d at 177 (same). Combined, these features of the omnibus clause ward off Miner's overbreadth and vagueness challenges.

That the statute applies only to conduct committed "corruptly" similarly defeats Miner's argument that all of his activities were constitutionally protected. If a defendant embarks upon a course of conduct specifically for the purpose of gaining an unlawful benefit or advantage, he is not necessarily insulated from punishment simply because the discrete acts in which he engages may be otherwise constitutionally or statutorily authorized. For example, although an individual certainly has a general right under the Petition Clause "to appeal to courts and other forums established by the government for resolution of legal disputes," *Borough of Duryea, Pa. v. Guarnieri*, 131 S. Ct. 2488, 2494 (2011), someone who files a frivolous lawsuit may legitimately be punished for malicious prosecution or abuse of process. *Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 743 (1983). At that point, in fact, the defendant is no longer exercising a constitutional right: "[S]ince sham litigation by definition does not involve a bona fide grievance, it does not come within the first amendment right to petition." *Id.* (citation omitted). Quite simply, then, § 7212(a)'s omnibus clause is not unconstitutional as applied to Miner because its limitation to "corrupt" conduct ensures that it reaches no constitutionally protected conduct whatsoever. *See Reeves*, 752 F.2d at 1001 (placing a common-law lien in preparation for a lawsuit against a third party is not protected by the First Amendment if it is done for "corrupt" purposes).

That said, a prosecution based on conduct that is closely related to citizens' rights to access the courts and to obtain information about their government must tread carefully. Nonfrivolous court filings—even those that are intended to impede the IRS's ability to collect taxes—are at the very core of the Petition Clause, meaning that even frivolous claims "are at least adjacent to areas of protected activity." *Reeves*, 752 F.2d at 1001. In this respect, the

government overstated its case, suggesting at trial that it was appropriate to base Miner's conviction on his threats to sue IRS officials because "You threaten [to sue] public officials at your own peril." To the extent that the government suggests that a defendant legitimately may be criminally prosecuted for non-frivolously informing governmental officials that they will be held accountable for their conduct in a court of law, its argument is incorrect. *See Borough of Duryea*, 131 S. Ct. at 2499 ("The right to petition traces its origins to Magna Carta . . . ."). If Miner had been non-frivolously expressing his clients' likelihood of suing IRS officials, was truly attempting to obtain information from the IRS via Privacy Act and FOIA requests, or was legitimately creating trusts to structure clients' finances in a manner that he believed was legal, then his conduct would not have been criminal.

But the jury found that Miner actually was doing none of those things. Instead, it concluded that Miner was using his letters and trusts for an entirely different purpose: to keep the IRS away from funds to which he knew it was legally entitled. Because the jury found that Miner acted "corruptly"—that is, for the specific purpose of achieving an unlawful advantage, *see McBride*, 362 F.3d at 372—when he threatened suit, filed FOIA and Privacy Act requests, and created the trusts in question, his conviction under § 7212(a)'s omnibus clause did not violate his constitutional or statutory rights. *See, e.g.*, *United States v. Winchell*, 129 F.3d 1093, 1099 (10th Cir. 1997) (a taxpayer's filing of frivolous documents against IRS agents constitutes a corrupt endeavor if the taxpayer "meant to . . . intimidate officers or agents of the [IRS] from collecting his just debt of taxes due"). And because Miner's conviction was appropriately predicated upon this conduct, his argument alleging insufficient evidence is without merit.

C.

Miner's final argument is that portions of Agent Lee's testimony were erroneously admitted at trial. We review a district court's evidentiary rulings for an abuse of discretion, which occurs when the district court "relies on clearly erroneous findings of fact, improperly applies the law, or employs an erroneous legal standard," *Griffin v. Finkbeiner*, 689 F.3d 584, 592 (6th Cir. 2012) (internal quotation marks omitted), or when we are "firmly convinced that a mistake has been made, *i.e.*, when we are left with a definite and firm conviction that the trial court committed a clear error of judgment." *United States v. Heavrin*, 330 F.3d 723, 727 (6th

Cir. 2003) (citation omitted). Even if the district court's evidentiary ruling was erroneous, it amounts to reversible error "only if it was not harmless; that is, only if it affected the outcome of the trial." *Cummins v. BIC USA, Inc.*, 727 F.3d 506, 510 (6th Cir. 2013), *cert. denied*, 134 S. Ct. 935 (2014).

The government argues that Agent Lee's testimony was properly admitted and that any erroneous admission was in any event harmless. Although we agree with the government that most of Miner's assertions have no merit, one portion of Agent Lee's testimony is somewhat troubling.

Over Miner's objection, Agent Lee was permitted to testify that, based on her review of the letters that Miner had prepared for his clients to send to the IRS, "it appears as though they were sent to impede the IRS rather than to obtain answers to real questions." Despite Miner's continued objections, Agent Lee testified in detail why she believed that the letters were intended to impede the IRS rather than to further a legitimate purpose: because (1) the letters were sent by individuals who had not filed tax returns for years; (2) the letters sought tax record amendations that were not possible under the Privacy Act; (3) the letters were "generally somewhat threatening or forceful in nature and included a clause that if you don't respond within 30 days, I will assume I am right, and that is not indicative of somebody who really wants to know the truth and to understand the tax law"; (4) follow-up letters demanding the same unrealizable remedies were sent even after the IRS responded that the writers should pursue other mechanisms for amending their tax information; and (5) "if somebody really wanted to understand the truth, they could simply go to the IRS office, obtain their transcript and ask somebody what some of the stuff means." Later, she identified specific portions of the letters that she believed were "specifically intimidating."

This, as Miner points out, is opinion and argument. Miner was correct to label it as such at trial, and the district court should not have admitted it into evidence. The government attempts to justify its conduct by claiming that the inference that Agent Lee drew from the materials was so obvious that it was acceptable for her to testify about it. But that misses the point. The jury, not the witness, must draw the inference; and the government should not "spoon-fe[e]d" its theory of the case to the jury through a government agent "with an aura of

expertise and authority" who might prompt the jury uncritically to substitute the agent's view of the evidence for its own. *United States v. Freeman*, 730 F.3d 590, 597, 599 (6th Cir. 2013).

The other problem with Agent Lee's testimony is that she was permitted to opine at length about "a mental state which constitutes an element of the crimes charged." *United States v. Windfelder*, 790 F.2d 576, 582 (7th Cir. 1986). Our rules of evidence do not permit government witnesses in tax cases to "directly embrace the ultimate question" of a defendant's intent. *United States v. Sabino*, 274 F.3d 1053, 1067 (6th Cir. 2001) (internal quotation marks omitted), *amended and superseded in part on other grounds*, 307 F.3d 446 (6th Cir. 2002). Even when a government agent is testifying as an expert witness in a criminal tax case, "the agent may not testify about the defendant's state of mind." *United States v. Powers*, 702 F.3d 1, 10–11 (1st Cir. 2012). That is because even an expert witness in a criminal case "must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone." Fed. R. Evid. 704(b); *see Windfelder*, 790 F.2d at 580–82 (noting that Rule 704(b) applies to questions of whether a defendant has the requisite willfulness or knowledge in a tax evasion case). *See also United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991) (noting that the jury is just as qualified as a witness to determine the defendant's *mens rea*).

Agent Lee's testimony violated this rule of evidence, detailing to the jury why she believed that Miner's letters were intended to "impede" the IRS rather than to seek legitimate relief. The motivation behind Miner's conduct was directly probative of the *mens rea* requirement of § 7212(a): whether Miner acted "corruptly"—that is, with the intent to seek an unlawful advantage, rather than for a legitimate purpose. *McBride*, 362 F.3d at 372.

Given that the admission of these aspects of Agent Lee's testimony was error, the remaining question is whether it was harmless, in light of the evidence otherwise indicating that Miner's purpose in engaging in all of his conduct—not only in sending the letters, but in creating the IMF decoding program and constructing the trusts—was to impede the IRS's ability to locate and recover taxable assets. If an evidentiary error did not "substantially sway[ ]" the jury, *United States v. Hardy*, 643 F.3d 143, 153 (6th Cir. 2011), or "had but very slight effect," *Kotteakos v. United States*, 328 U.S. 750, 764 (1946), and thus did not "materially affect[ ]" the verdict, it is

not a basis for reversal. *United States v. Trujillo*, 376 F.3d 593, 611 (6th Cir. 2004). Where "the record is so evenly balanced that a conscientious judge is in grave doubt as to the harmlessness of an error," the judgment must be reversed. *O'Neal v. McAninch*, 513 U.S. 432, 437 (1995); *Jaradat v. Williams*, 591 F.3d 863, 869 (6th Cir. 2010). "[T]he scale, if equal, tips in favor of the defendant." *Ruelas v. Wolfenbarger*, 580 F.3d 403, 413 (6th Cir. 2009).

The error here was harmless. First, Agent Lee testified improperly only regarding Miner's intent vis-à-vis the letters that Miner wrote; her testimony did not touch upon his intent on setting up his schemes in the first place. Second, voluminous evidence was properly admitted at trial indicating that Miner was aware of pending IRS proceedings implicating his clients when he advised them to put their assets into anonymous trusts and to write letters to the IRS threatening legal action. Such awareness, when paired with frivolous efforts at defeating assessment or recovery of tax, overwhelmingly established Miner's corrupt intent. *See Aguilar*, 515 U.S. at 599; *Kassouf*, 144 F.3d at 958.

Third, the mechanisms that Miner used to respond to the IRS's assessment and collections efforts were transparently frivolous. Miner advised his clients to avoid linking their trusts to themselves via their social security numbers and to fund the trusts with cash to avoid leaving a paper trail, and several of his clients admitted that the entire purpose of the trusts was to hide their assets from the IRS. A duly qualified expert witness agreed that the trusts were "sham" creations with almost no conceivable purpose other than an attempt to avoid paying income tax. Finally, even Miner believed that the letters he sent to the IRS were frivolous: he advised at least one of his clients to forward a prepared letter "in response to [an IRS] Notice of Deficiency" that, although it would probably not be answered by the IRS, would hopefully "stall the IRS long enough for us to clean up your IMF."

Given the abundant evidence that Miner knew that many of his clients were attempting to resolve extant IRS proceedings and that his solutions were (a) to hide assets from the IRS in fictive trusts, and (b) to badger the IRS with admittedly-frivolous letters in the hope that the IRS would be too bogged down to contest requested amendments to clients' taxpayer records, we conclude beyond a reasonable doubt that the jury would have come to the same result on the

question of his intent, even absent the improper aspects of Agent Lee's testimony. Thus, the district court's error in this respect was harmless.

III.

For these reasons, we affirm the judgment of the district court.