NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

File Name: 19a0329n.06

Case No. 18-5989

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

FILED
Jun 28, 2019
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| WILLIAM DUKES, JR., | ) | KENTUCKY |
| | ) | |
| Defendant-Appellant. | ) | |

BEFORE: McKEAGUE, THAPAR, and MURPHY, Circuit Judges.

THAPAR, Circuit Judge. It is usually not a good thing to see the flashing lights of law enforcement behind you. Sometimes you get lucky, and the officer just gives you a warning; other times you are not so lucky, and you get a ticket. But the string of horrors Officer William Dukes Jr. paraded on Jeffrey Littlepage after a simple traffic stop has no place in our society. We affirm Dukes's conviction for willfully depriving Littlepage of his constitutional right to be free from unreasonable seizures.

I.

Late one evening, Jeffrey Littlepage decided to go for a drive to clear his head. Officer William Dukes Jr. was also out that same night patrolling the roads when he got a call notifying him that a driver had tried to run someone off the road. Suspecting Littlepage was that driver,

Dukes pulled him over. He approached Littlepage's car and asked him to get out. When Littlepage did not respond quickly enough for Dukes, Dukes pulled him out. Unfortunately, the encounter did not end there. Dukes proceeded to frisk Littlepage, and it was not your ordinary frisk. Instead, Dukes "goosed" Littlepage (hit him in the genitals) and hit him in the back (after Littlepage had told him he had a bad back). R. 83, Pg. ID 1251. He then told Littlepage he was free to go, but not without giving him a warning. Dukes told him to stay off that road, and if he returned "down here, you'll answer to me." R. 82, Pg. ID 1008.

Unfortunately, Littlepage's troubles with Dukes were just beginning. Littlepage needed to return to that very road the next day to pick up a friend. But he was confused and traumatized by the first incident, and he did not know what would happen if he ended up on that road again. So he attempted to file a complaint against Dukes and figure out if he could drive on that road the next day.

First, he called the Providence Police Department (where Dukes worked). The dispatcher told Littlepage that he could come in the next morning to file a complaint with the Chief of Police. But this posed a problem because Littlepage needed to travel down that road the next morning. So the dispatcher offered Littlepage the chance to speak to the officer on duty who, unfortunately, was Dukes. This conversation ended up only making things worse. Dukes told Littlepage that he could come in the next week to file a complaint, then he abruptly hung up on him. This left Littlepage uncertain about what to do next: come in the next morning or wait until the next week. So Littlepage called back. This time, Dukes answered, and before Littlepage could even get his question out, Dukes threatened to arrest him for harassing communications if he ever called again.

Afraid of Dukes's threats and still not sure how to file a complaint, Littlepage decided to seek advice elsewhere. He called the Webster County Sheriff's office, but when they did not fully

answer his question, he next turned to the Kentucky State Police. After that call, the State Police dispatcher called the Providence Police Department and told them about Littlepage's call to ensure that Littlepage did not receive inconsistent information from different agencies.

Dukes soon got wind of Littlepage's additional calls, and he hatched a plan to respond. He instructed the Providence dispatcher to call Littlepage and tell him that he could come down to the police station and complain to a supervisor, even though a supervisor was not on duty that night. Littlepage suspected this was "a trap" and instead asked if the supervisor could come to his house. *Id. at* 1024. The dispatcher said no but nevertheless asked Littlepage for his address. After confirming that no one would come and "harass" or "arrest" him, Littlepage complied. *Id.* at 1025. He then went to bed for the night.

But Littlepage's sleep was cut short when Dukes showed up at his house, banged on his door until he answered, and said, "Get your clothes on. You're under arrest." *Id.* at 1026. Retreating back into his home, Littlepage told Dukes he was not going to "go[] to jail for something [he] didn't do." *Id.*

Dukes followed Littlepage into his house, and things quickly escalated. In the ensuing melee (captured on Dukes's body camera), Dukes shot Littlepage twice with a taser, sprayed him in the face with pepper spray, punched him in the nose (thereby breaking it), and hit him with his baton multiple times. Next, Dukes handcuffed Littlepage. Once they were outside, Dukes told the responding EMT that "he hadn't been in a good fight like this in a long while." R. 83, Pg. ID 1152, 1156. Littlepage went to the hospital to recover, at which point Dukes issued him citations for (1) harassing communications, (2) resisting arrest, (3) assaulting a police officer, and (4) criminal mischief (for allowing his broken nose—courtesy of Dukes—to bleed on Dukes's uniform).

The county attorney dismissed these charges and contacted the Kentucky Attorney General's Office to report Dukes's misconduct. That office in turn referred the case to the U.S. Attorney's Office, which led to a federal indictment that charged Dukes with (1) willfully depriving Littlepage of his constitutional right to be free from unreasonable seizures by arresting him without probable cause, (2) willfully depriving Littlepage of his constitutional right to free speech, and (3) making a false entry in a record or document in relation to a matter within the jurisdiction of the FBI. The jury heard testimony from Dukes, Littlepage, and other witnesses, viewed video recordings of the initial traffic stop and subsequent arrest, and listened to audio recordings of Littlepage's phone calls. After considering this evidence, the jury convicted Dukes on count one but acquitted him of counts two and three. The court sentenced Dukes to forty-two months in prison. Dukes now appeals, challenging the sufficiency of the evidence and an evidentiary ruling at trial.

## II.

## A.

Dukes argues that the government did not present sufficient evidence that he was guilty of depriving Littlepage of his right to be free from unreasonable seizures. When reviewing sufficiency-of-the-evidence claims, we view the evidence in the light most favorable to the government and ask whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

The elements of Dukes's crime—willfully seizing Littlepage without probable cause—are that Dukes (1) acted willfully, (2) acted under color of law, and (3) deprived Littlepage of his constitutional right to be free from unreasonable seizures by arresting him without probable cause. 18 U.S.C. § 242. While probable cause is a question for the judge to decide when it arises in a

motion to suppress, it is a question for the jury when it is an element of the crime. *United States v. Gaudin*, 515 U.S. 506, 521 (1995).

Dukes argues that the government failed to prove that he lacked probable cause to arrest Littlepage for harassing communications. Harassing communications under Kentucky law has three elements: (1) an electronic or written communication made in a manner that "causes annoyance or alarm," (2) that is made with the intent to "intimidate, harass, annoy, or alarm another person," and (3) the communication serves "no purpose of legitimate communication." Ky. Rev. Stat. Ann. § 525.080. Dukes maintains that he could arrest Littlepage because his calls served no legitimate purpose.

Contrary to Dukes's claim, the evidence overwhelmingly shows there was no probable cause since Littlepage's calls had a legitimate purpose. In fact, even Dukes admits that Littlepage was trying to obtain information about filing a complaint and about where he could permissibly drive. Both are legitimate purposes for his calls. Dukes and the dispatcher provided Littlepage with inconsistent information, thus requiring multiple calls for clarification. The dispatcher told Littlepage he could talk to the police chief the next *morning*, but Dukes said Littlepage had to wait until the following *week*. Neither Dukes nor the dispatcher clarified whether Littlepage could drive on the road again. And after the second call, Littlepage still did not have answers to his questions, so he called two other law enforcement agencies to seek advice. The jury heard recordings of these phone calls, and two of the dispatchers testified that, in their opinions, Littlepage's call to them had been made for a legitimate purpose. Though Dukes may view the evidence differently, a rational juror could conclude that Dukes lacked probable cause to arrest Littlepage.

B.

Dukes argues that the testimony of one of the government's experts—Thomas Szurlinski—impermissibly took the probable cause question from the jury. Testimony on an ultimate issue in a case (such as whether there was probable cause) is not automatically inadmissible. Fed. R. Evid. 704(a). But an expert cannot provide the jury with a legal conclusion. *Torres v. Cty. of Oakland*, 758 F.2d 147, 150–51 (6th Cir. 1985).

Szurlinski is a lawyer, former police officer, and former instructor at the Kentucky Department of Criminal Justice Training. While he was teaching there, he trained Dukes on the Kentucky Penal Code and Constitutional Criminal Procedure. And Dukes did well in class—scoring an 87 out of 100.

The government used Szurlinski's testimony to prove that Dukes acted willfully, i.e., that he knowingly violated or at least recklessly disregarded Littlepage's constitutional rights. *See Screws v. United States*, 325 U.S. 91, 105 (1945) (plurality opinion) (explaining that "willfully" means acting "in open defiance or in reckless disregard" of a constitutional right). Szurlinski testified about two aspects of Dukes's training. First, Szurlinski said he taught Dukes and his classmates that a call constitutes a harassing communication only if it is made without a legitimate purpose. Second, Szurlinski explained that he taught Dukes the requirements under Kentucky law for making a warrantless arrest for a misdemeanor crime: an officer can make such an arrest only if the misdemeanor was committed in the officer's presence. *See* Ky. Rev. Stat. Ann. § 431.005(1)(d). Szurlinski then applied those laws to the facts here. He testified that in his opinion, those laws did not support Dukes's arrest of Littlepage. At the close of the evidence, the district court instructed the jury that they could consider Szurlinski's testimony *only* to determine whether Dukes had acted willfully—*not* to determine whether Dukes had violated the

Constitution—and that it was "wholly up to [them] to determine whether" Dukes acted inconsistent with his training. R. 45, Pg. ID 187.

Despite those instructions, Dukes argues that the jury relied on Szurlinski's testimony to decide whether Dukes had probable cause to arrest Littlepage. While Szurlinski did not use the words "probable cause," he explained that he did not "see any justification for . . . Dukes making an arrest for harassing communications in this instance." R. 54, Pg. ID 271. Dukes says that this testimony was an inadmissible legal conclusion and went to the "ultimate issues" in the case. Appellant Br. at 27.

Szurlinski's testimony came close to being impermissible. And for the government, often less is more. With an overwhelming case in its pocket, there was no good reason for the government to test the lines of permissibility. Luckily for the government, we need not decide if this testimony resulted in error because even if it did, any error was harmless. *See United States v. Miner*, 774 F.3d 336, 350 (6th Cir. 2014) (applying harmless-error review to the erroneous admission of an expert's testimony that the defendant had acted intentionally). First, as previously discussed, the government produced overwhelming evidence of Dukes's guilt. Second, the court expressly instructed the jury not to consider Szurlinski's testimony when deciding whether Dukes lacked probable cause. *See Hensley v. McGinnis*, 188 F.3d 507, 1999 WL 685932, at *4 (6th Cir. 1999) (table) (finding admission of inadmissible evidence to be harmless "particularly in light of the trial court's limiting instruction"). And we presume that jurors follow the court's instructions. *United States v. Ford*, 872 F.2d 1231, 1239 (6th Cir. 1989) (citing *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987)). Thus, any error in admitting Szurlinski's testimony was harmless. *See Miner*, 774 F.3d at 350 (finding the error to be harmless given the other evidence).

We affirm.